## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE R. KENTON MUSGRAVE, SENIOR JUDGE

|  |  |  |
|---|---|---|
| UNITED STATES STEEL CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Ct. No. 12-00070 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| HYUNDAI HYSCO LTD., | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

### ORDER

Upon consideration of the Motion for Judgment on the Agency Record of Plaintiff United States Steel Corporation, the responses thereto, and all other papers and proceedings herein, it is hereby

ORDERED that Plaintiff United States Steel Corporation's Motion for Judgment on the Agency Record is granted; and it is further

ORDERED that the portions of the final results in the countervailing duty administrative review in Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea, 77 Fed. Reg. 13093 (Dep't Commerce Mar. 5, 2012) (final results) ("Final Results"), challenged by Plaintiff United States Steel Corporation are not supported by substantial evidence on the record and are otherwise not in accordance with law; and it is further

ORDERED that this matter is remanded to the U.S. Department of Commerce for redetermination of the contested portions of the Final Results.

SO ORDERED.

_____,
R. Kenton Musgrave, Senior Judge

Ct. No. 12-00070

Dated: _____
        New York, NY

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE R. KENTON MUSGRAVE, SENIOR JUDGE

| | |
|---|---|
| UNITED STATES STEEL CORPORATION, )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>and )<br><br>HYUNDAI HYSCO LTD., )<br><br>Defendant-Intervenor. ) | Ct. No. 12-00070 |

## MOTION OF PLAINTIFF UNITED STATES STEEL CORPORATION FOR JUDGMENT ON THE AGENCY RECORD UNDER RULE 56.2

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, Plaintiff United States Steel Corporation ("U.S. Steel") hereby moves for judgment on the agency record with regard to the portion of the final results in the countervailing duty administrative review in <u>Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea</u>, 77 Fed. Reg. 13093 (Dep't Commerce Mar. 5, 2012) (final results), contested by U.S. Steel.

U.S. Steel respectfully moves, for the reasons explained in the accompanying Memorandum, for this Court to hold that the contested portions of the final results are unsupported by substantial evidence on the record and are otherwise not in accordance with law.

U.S. Steel further moves for the Court to remand this matter to the U.S. Department of Commerce for disposition consistent with the order and opinion of the Court.

Respectfully submitted,

Robert E. Lighthizer
Jeffrey D. Gerrish
Nathaniel B. Bolin

On behalf of United States Steel Corporation

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE R. KENTON MUSGRAVE, SENIOR JUDGE

|  |  |  |
|---|---|---|
| UNITED STATES STEEL CORPORATION, | ) | **NON-CONFIDENTIAL** |
| Plaintiff, | ) | |
| v. | ) | Ct. No. 12-00070 |
| UNITED STATES, | ) | |
| Defendant, | ) | |
| and | ) | |
| HYUNDAI HYSCO LTD., | ) | |
| Defendant-Intervenor. | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF UNITED STATES STEEL
CORPORATION'S MOTION FOR JUDGMENT ON THE
AGENCY RECORD UNDER RULE 56.2**

SKADDEN, ARPS, SLATE
 MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7000

Dated: October 26, 2012

# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE R. KENTON MUSGRAVE, SENIOR JUDGE

|  |  |
|---|---|
| UNITED STATES STEEL CORPORATION, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>UNITED STATES, )<br>)<br>Defendant, )<br>)<br>and )<br>)<br>HYUNDAI HYSCO LTD., )<br>)<br>Defendant-Intervenor. )<br>) | **NON-CONFIDENTIAL**<br><br>Ct. No. 12-00070 |

**MEMORANDUM IN SUPPORT OF PLAINTIFF UNITED STATES STEEL CORPORATION'S MOTION FOR JUDGMENT ON THE AGENCY RECORD UNDER RULE 56.2**

SKADDEN, ARPS, SLATE
 MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7000

Dated:  October 26, 2012

# TABLE OF CONTENTS

I.   STATEMENT PURSUANT TO RULE 56.2(c) ........................................................ 1

    A.   The Administrative Determination Under Review ............................................1

    B.   Issue of Law Presented ........................................................................................1

II.   STATEMENT OF FACTS .......................................................................................... 1

III.   STANDARD OF REVIEW ...................................................................................... 12

IV.   ARGUMENT ............................................................................................................ 13

    A.   Summary of Argument ........................................................................................13

    B.   The Department Failed To Comply With The Statute And Its
       Regulations When It Used An Artificial Loan Benchmark To Measure
       The Benefit To HYSCO From The KEXIM Loans Where Actual
       Rates For Comparable Commercial Loans Were Available .........................15

V.   CONCLUSION ........................................................................................................ 20

# TABLE OF AUTHORITIES

**CASES**

Allegheny Ludlum Corp. v. United States, 112 F. Supp. 2d 1141 (Ct. Int'l Trade 2000) ...................................................................................................................12, 19

Amanda Foods (Vietnam) Ltd. v. United States, 807 F. Supp. 2d 1332, 1342 (Ct. Int'l Trade 2011) ......................................................................................................................13

Ceramica Regiomontana, S.A. v. United States, 636 F. Supp. 961 (Ct. Int'l Trade 1986)....13

Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984)...............12, 13

Consol. Edison Co. v. NLRB, 305 U.S. 197 (1938)...............................................................12

Nippon Steel Corp. v. United States, 337 F.3d 1373 (Fed. Cir. 2003) ...................................12

Service v. Dulles, 354 U.S. 363, 388 (1957) ..........................................................................13

United States v. Nixon, 418 U.S. 683, 696 (1974) ..................................................................13

Universal Camera Corp. v. NLRB, 340 U.S. 474 (1951) ........................................................12

Usinor Sacilor v. United States, 893 F. Supp. 1112 (Ct. Int'l Trade 1995)...........................13

Vitarelli v. Seaton, 359 U.S. 535, 539-40 (1959) ...................................................................13

WelCom Products, Inc. v. United States, CIT Slip. Op. 12-124 (Ct. Int'l Trade Sept. 27, 2012) .................................................................................................................12, 19

Wheatland Tube Co. v. United States, 495 F.3d 1355 (Fed. Cir. 2007)................................13

**STATUTES AND REGULATIONS**

19 U.S.C. § 1516a(b)(1)(B)(i) (2006)....................................................................................12

19 U.S.C. § 1677(5)(E)......................................................................................................15, 18

19 C.F.R. § 351.105(a)(2)(iv) (2012) ......................................................................................9

19 C.F.R. § 351.105(a)(3).............................................................................................16, 18, 19

19 C.F.R. § 351.106(b) (2012) .................................................................................................5

## OTHER AUTHORITIES

Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea, 71 Fed. Reg.
53413 (Dep't Commerce Sept. 11, 2006) (prelim. results) ...................................2, 3, 4, 17

Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea, 72 Fed. Reg.
119 (Dep't Commerce Jan. 3, 2007) (final results) ...................................................2, 4, 17

Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea, 72 Fed. Reg.
51602 (Dep't Commerce Sept. 10, 2007) (prelim. results) .......................................2, 4, 17

Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea, 73 Fed. Reg.
2444 (Dep't Commerce Jan. 15, 2008) (final results) ...............................................2, 4, 17

Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea, 73 Fed. Reg.
52315 (Dep't Commerce Sept. 9, 2008) (prelim. results) .........................................2, 4, 17

Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea, 74 Fed. Reg.
2512 (Dep't Commerce Jan. 15, 2009) (final results) ...............................................2, 4, 17

Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea, 74 Fed. Reg.
46100 (Dep't Commerce Sept. 8, 2009) (prelim. results) .........................................2, 4, 17

Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea, 74 Fed. Reg.
55192 (Dep't Commerce Oct. 27, 2009) (final results)..............................................2, 4, 17

Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea, 75 Fed. Reg.
55745 (Dep't Commerce Sept. 14, 2010) (prelim. results) .......................................2, 4, 17

Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea, 76 Fed. Reg.
3613 (Dep't Commerce Jan. 20, 2011) (final results) ...............................................2, 4, 18

Countervailing Duties, 62 Fed. Reg. 8818 (Dep't Commerce Feb. 26, 1997)
(proposed rule)........................................................................................................2, 4, 17

Countervailing Duties: Final Rule, 63 Fed. Reg. 65348(Dep't Commerce Nov. 25, 1998)
(final rule) ...............................................................................................................2, 4, 17

## I.      STATEMENT PURSUANT TO RULE 56.2(c)

This memorandum is submitted by Plaintiff United States Steel Corporation ("U.S. Steel")

in support of its Motion for Judgment on the Agency Record under United States Court of

International Trade Rule 56.2 in the above-captioned action.

### A.      The Administrative Determination Under Review

The administrative determination under review is the final results of the countervailing

duty ("CVD") administrative review issued by the U.S. Department of Commerce (the

"Department" or "Commerce") in Certain Corrosion-Resistant Carbon Steel Flat Products from

the Republic of Korea, 77 Fed. Reg. 13093 (Dep't Commerce March 5, 2012) (final results)

("Final Results") (P.R. 2.49).[1]

### B.      Issue of Law Presented

1.      Whether the Department properly determined the benchmark
interest rate that it used to measure the benefit to Hyundai HYSCO
Ltd. ("HYSCO") from certain short-term export financing loans
provided by the Government of Korea ("GOK").

## II.     STATEMENT OF FACTS

On September 29, 2010, Commerce initiated an administrative review of the CVD order

on certain corrosion-resistant carbon steel flat products ("corrosion-resistant steel") from the

Republic of Korea.  The administrative review covered a period of review ("POR") of January 1

through December 31, 2009 (the "2009 administrative review") and involved a single Korean

producer and exporter of corrosion-resistant steel, HYSCO.  Corrosion-Resistant Carbon Steel

---

[1]      Citations to public documents in the record are designated as P.R. __.  Citations to
confidential documents in the record are designated as C.R. __.  In these citations, the
numeral before the decimal point refers to either part one or part two of the
administrative record, and the numeral after the decimal point refers to the document
number.

*Flat Products from the Republic of Korea*, 76 Fed. Reg. 54209 (Dep't Commerce Aug. 31, 2011) (prelim. results) ("2009 POR Prelim.") (P.R. 2.10).  The 2009 administrative review marked the sixth administrative review to be initiated by Commerce since the CVD order was issued.  *See Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea*, 71 Fed. Reg. 53413 (Dep't Commerce Sept. 11, 2006) (prelim. results) ("2004 POR Prelim."); *Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea*, 72 Fed. Reg. 119 (Dep't Commerce Jan. 3, 2007) (final results) ("2004 POR Final"); *Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea*, 72 Fed. Reg. 51602 (Dep't Commerce Sept. 10, 2007) (prelim. results) ("2005 POR Prelim."); *Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea*, 73 Fed. Reg. 2444 (Dep't Commerce Jan. 15, 2008) (final results) ("2005 POR Final"); *Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea*, 73 Fed. Reg. 52315 (Dep't Commerce Sept. 9, 2008) (prelim. results) ("2006 POR Prelim."); *Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea*, 74 Fed. Reg. 2512 (Dep't Commerce Jan. 15, 2009) (final results) ("2006 POR Final"); *Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea*, 74 Fed. Reg. 46100 (Dep't Commerce Sept. 8, 2009) (prelim. results) ("2007 POR Prelim."); *Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea*, 74 Fed. Reg. 55192 (Dep't Commerce Oct. 27, 2009) (final results) ("2007 POR Final"); *Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea*, 75 Fed. Reg. 55745 (Dep't Commerce Sept. 14, 2010) (prelim. results) ("2008 POR Prelim."); *Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea*, 76 Fed. Reg. 3613 (Dep't Commerce Jan. 20, 2011) (final results) ("2008 POR Final").

In the 2009 administrative review, as it had done in each of the five previous administrative reviews, Commerce investigated the GOK's provision of short-term export

NON-CONFIDENTIAL

financing loans to Korean manufacturers and exporters of corrosion-resistant steel through the Export-Import Bank of Korea ("KEXIM"). See 2009 POR Prelim., 76 Fed. Reg. at 54211 (P.R. 2.10). The GOK established these so-called "KEXIM loans" to cover from 50 to 90 percent of the cost of an eligible company's exports, thereby encouraging the company receiving the loans to export. See id. and 2004 POR Prelim., 71 Fed. Reg. at 53419.

In response to the Department's CVD questionnaire in the 2009 administrative review, HYSCO reported that it maintained [     ] short-term export financing loans from KEXIM that the company had taken out in 2008. HYSCO Response to the Department's Countervailing Duty Questionnaire (Dec. 15, 2010) ("HYSCO Dec. 15, 2010 Response") at Exhibit K-1, pp. 1-2 (C.R. 1.3). According to HYSCO, under the short-term export financing program, KEXIM loans are provided "when the exporter makes a particular request for export financing, and KEXIM issues a separate notice of approval for each loan. Thus, the notice of approval is the date of agreement, which is also the date of receipt." HYSCO Response to the Department's Feb. 17 2011 Supplemental CVD Questionnaire (Mar. 17, 2011) at 14 (P.R. 1.27). A loan schedule supplied by HYSCO showed that its [     ] KEXIM loans were approved and received on [

]. Id. at Exhibit K-5 (C.R. 1.8). The maturity date of the

[     ] KEXIM loans [                    ]. Id.

In each of the previous five administrative reviews, Commerce had measured the countervailable benefit from the KEXIM loans by comparing the interest rate that the company respondent paid on the KEXIM loans with a benchmark interest rate composed of either (i) the annual weighted average of the interest rates that commercial lenders charged the company respondent for short-term loans taken out in the same year as the KEXIM loans or (ii) in cases where the company respondent had not received any short-term loans from commercial lenders,

the annual average of national short-term interest rates for that same year.  See 2004 POR

Prelim., 71 Fed. Reg. at 53414 unchanged in 2004 POR Final, 72 Fed. Reg. 119; 2005 POR

Prelim., 72 Fed. Reg. at 51603 (prelim. results) unchanged in 2005 POR Final, 73 Fed. Reg.

2444; 2006 POR Prelim., 73 Fed. Reg. at 52316 unchanged in 2006 POR Final, 74 Fed. Reg.

2512; 2007 POR Prelim., 74 Fed. Reg. at 46101 unchanged in 2007 POR Final, 74 Fed. Reg.

55192; 2008 POR Prelim., 75 Fed. Reg. at 55746-55747 unchanged in 2008 POR Final, 76 Fed.

Reg. 3613.

In the preliminary results of the 2009 administrative review, Commerce adopted the same

methodology.  In particular, Commerce sought and received information from HYSCO

concerning the short-term loans that HYSCO received from commercial lenders during 2008 and

2009.  See 2009 Prelim. Results, 76 Fed. Reg. at 54210 (P.R. 2.10); HYSCO Dec. 15, 2010

Response at Exhibit K-1, p. 3 and Exhibit K-4 (C.R. 1.3).  Commerce also obtained from the

GOK the annual and monthly national average short-term interest rates for commercial loans in

Korea during 2008 and 2009.  See GOK Response to the Department's CVD Questionnaire (Dec.

15, 2010) at Exhibits J-1 and J-4 (P.R. 1.18).

Commerce used this information to calculate the benefit to HYSCO from the KEXIM

loans in the preliminary results.  Specifically, Commerce compared the interest rates paid by

HYSCO on the KEXIM loans to the weighted-average interest rate for comparable short-term

loans that HYSCO took out from commercial lenders in the same year (i.e., 2008) as the KEXIM

loans.  See 2009 POR Prelim., 76 Fed. Reg. at 54211 (P.R. 2.10).  Commerce divided the

resulting benefit by the value of HYSCO's total exports.  Id.  The result was a net subsidy rate of

0.09 percent ad valorem.  Id.  When combined with the benefit from other countervailable

subsidies that HYSCO received during the POR, this brought HYSCO's total ad valorem subsidy

**NON-CONFIDENTIAL**

rate to 0.52 percent, which was above the 0.50 percent *de minimis* threshold established by the Department. See The Department's Post-Preliminary Analysis Memorandum for HYSCO (Sept. 27, 2011) ("Post-Prelim. Results Memo") (P.R. 2.18); 19 C.F.R. § 351.106(b) (2012).

The Department invited the interested parties to submit case and rebuttal briefs commenting on the preliminary results. 2009 POR Prelim., 76 Fed. Reg. at 54216 (P.R. 2.10). In its case brief, HYSCO claimed that the Department erred in calculating the benchmark interest rate for the KEXIM loans based on the interest rates of short-term commercial loans that HYSCO took out in 2008. HYSCO Case Brief (Oct. 11, 2011) at 2-4 (P.R. 2.20). According to HYSCO, due to what it described as "significant" variations in Korean interest rates between 2008 and 2009, and the fact that the interest rates for the KEXIM loans varied according to the date of each payment on the loans, the Department should instead have used the annual average of the interest rates charged on certain short-term loans that HYSCO had taken out in 2009. Id. at 4-5.

Subsequently, the Department issued a supplemental questionnaire to HYSCO requesting additional information on certain of the 2008 short-term commercial loans reported by HYSCO that formed the basis for the Department's benchmark interest rate calculation in the preliminary results. The Department's Loan Benchmark Supplemental Questionnaire (Nov. 18, 2011) at 3 (P.R. 2.24). As part of this request, the Department asked HYSCO to provide copies of the loan contracts, an explanation of how the interest rates were derived, and a list of all interest payments made for all variable rate short-term loans that HYSCO obtained from commercial lenders in 2008, including [      ] loans reported by HYSCO in its response to the countervailing duty questionnaire in this case. Id. (C.R. 2.12).

HYSCO provided this information in a response submitted on December 2, 2011.

**NON-CONFIDENTIAL**

HYSCO's Response to the Loan Benchmark Supplemental Questionnaire (Dec. 2, 2011)

("HYSCO Dec. 2, 2011 Supplemental Response") at 1 and Exhibit K-8 (C.R. 2.13).  HYSCO's

response showed that [                    ] loans in question were – just like the KEXIM loans –

short-term variable rate loans that HYSCO had taken out in 2008.  Id. at 1 and Exhibit K-9.

HYSCO obtained these [    ] loans from [    ] commercial lenders – i.e., [

].  Id.  Moreover, just like the KEXIM loans, [


].  Id. at 1 and Exhibit K-9; HYSCO Submission of

Corrections to Dec. 15 Questionnaire Response (Aug. 11, 2011) at Exhibit K-7 (C.R. 2.1).

Commerce requested and received a second round of case and rebuttal briefs from the

parties concerning the new loan benchmark information submitted by HYSCO.  The

Department's Memorandum Re: Briefing Schedule for Post Preliminary New Information

Concerning the Short-term Benchmark Interest Rate (Nov. 18, 2011) (P.R. 2.25); HYSCO's

Supplemental Loan Benchmark Case Brief (Dec. 12, 2011) (P.R. 2.29); U.S. Steel's

Supplemental Loan Benchmark Rebuttal Brief (Dec. 19, 2011) (P.R. 2.30).  In its supplemental

case brief, HYSCO continued to argue that the Department should use the annual average of the

interest rates charged on all the short-term loans that HYSCO had taken out in 2009 as the

benchmark for its KEXIM loans.  See HYSCO Supplemental Loan Benchmark Case Brief (Dec.

12, 2011) at 1-8 (P.R. 2.29).

Shortly after completion of the second round of briefing on the loan benchmark issue,

Commerce again requested additional information from HYSCO regarding the calculation of

interest rate benchmarks for the KEXIM loans.  See The Department's Second Loan Benchmark

Supplemental Questionnaire (Dec. 22, 2011) (P.R. 2.31).  Specifically, the Department requested

NON-CONFIDENTIAL

that HYSCO demonstrate how the interest rates for the variable rate short-term loans that

HYSCO took out from commercial lenders (i.e., the [                              ]) were

determined. Id. at 3-4 (C.R. 2.16).  In particular, the Department requested information

concerning how these lenders determined (i) the base interest rate for such loans, (ii) the spread

that was added to the base rate, and (iii) any charges and fees associated with the loans in

question. Id. (P.R. 2.31).

　　　HYSCO responded to this request from the Department with information that showed

that the interest rates for the variable rate short-term loans that it received from [

] were dependent upon and specific to [


].  HYSCO's Response to the Department's Second Loan Benchmark Supplemental

Questionnaire (Jan. 11, 2012) at 1-5 (C.R. 2.17). Specifically, the documentation provided by

HYSCO showed that the interest rates for the variable rate short-term loans in question were

established by a base rate [

] plus a spread. Id. at 1-4.  In turn, the spread for these loans was

determined based on [

].  Id. at 2-

4.  For example, the [            ] loan received by HYSCO [                         ] but

was [                                         ].  See id. at 4 and Exhibit K-13.

As a result of [

].  See id.

　　　Similarly, HYSCO's response revealed that the interest rate for HYSCO's [       ] variable

rate short-term loan – i.e., the loan received from [         ] – was [       ] determined based on

**NON-CONFIDENTIAL**

[

]. See id. at 2-4.  Specifically, the interest rate was

comprised of a base interest rate, a spread, [                                    ].  Id.  The spread was

determined [                                                              ].  Id.  The

[                              ] was [

].  Id. at 2.

On December 28, 2011, Commerce requested that the parties submit a third round of case

and rebuttal briefs on the loan benchmark issue and the new information provided by HYSCO.

The Department's Memorandum Re: Briefing Schedule for HYSCO's Second Post Preliminary

Questionnaire Concerning Additional Information on the Short-term Benchmark Interest Rate

(Dec. 28, 2011) (P.R. 2.32).  In its supplemental case brief, U.S. Steel argued that there

continued to be no basis to reject the benchmark used by Commerce in the preliminary results

(i.e., the annual average of the interest rates on all short-term loans that HYSCO obtained from

commercial lenders in 2008) because that benchmark fully complied with the requirements of the

statute and the Department's regulations and practice.  U.S. Steel Supplemental Case Brief (Jan.

17, 2012) at 1-6 (P.R. 2.36).  In the alternative, U.S. Steel argued that it would be appropriate

under the statute and the Department's regulations and practice to base the short-term loan

benchmark on the interest rates that HYSCO actually paid on the variable rate short-term loans

that HYSCO received from commercial lenders in 2008.  Id. at 5-6 (C.R. 2.18).  Finally, U.S.

Steel noted that although the Department had not stated any intention of doing so, its request for

information on the components of the interest rates charged by [                              ] on the

short-term variable rate loans that they issued to HYSCO suggested that Commerce might be

considering departing from the requirements of the statute and its regulations and practice and constructing an artificial benchmark interest rate. Id. at 6 (P.R. 2.36). U.S. Steel argued that it would not be consistent with the statute or the Department's regulations to use an artificial benchmark interest rate where preferable alternatives were available. Id. at 6-9 (C.R. 2.18).

HYSCO's response to these arguments was to continue to claim that Commerce should use the annual average of the interest rates that it paid on commercial short-term loans in 2009 as the benchmark interest rate. HYSCO Benchmark Interest Rebuttal Brief (Jan. 20, 2012) at 1-7 (P.R. 2.37). HYSCO also disputed that Commerce might be considering using an artificial, constructed interest rate benchmark, claiming that there was no evidence that Commerce was considering doing so. Id. at 7. It contended that, in any event, the benchmark interest rate that Commerce used must account for what HYSCO claimed was a "significant" decline in base interest rates between late 2008 and 2009, when HYSCO finished repaying the KEXIM loans at issue. Id.

Commerce issued the final results of the 2009 administrative review on March 5, 2012. Final Results, 77 Fed. Reg. 13093. In the Final Results, Commerce rejected HYSCO's argument that the benefit from the KEXIM loans should be determined based on the annual average interest rate of short-term loans that HYSCO received from commercial lenders in 2009. Issues and Decision Memorandum in Final Results, 77 Fed. Reg. 13093 ("Final IDM") at Comment 1, pp. 9-10 (P.R. 2.40). In doing so, Commerce was careful to emphasize that interest rates on short-term commercial loans taken out in 2009 could not be used as the benchmark because "the CVD regulations are explicit" that "for short-term loans, the Department will use an interest rate on comparable commercial loans based on 'the year in which the government-provided loan was taken.'" Id. at 10 (citing and quoting 19 C.F.R. § 351.505(a)(2)(iv)). Because the KEXIM loans

at issue were taken out in 2008, Commerce reasoned, "the short-term loan benchmark is to be based on information from comparable commercial loans taken out in 2008." Id. In so doing, Commerce also rejected HYSCO's claim that declines in interest rates between late 2008 and 2009 warranted the use of a 2009 annual average interest rate as the benchmark. Id. at 10. It found that HYSCO and the GOK had failed to establish that Korea was experiencing hyperinflation over the relevant time period, which the Department emphasized was the necessary prerequisite for deviating from its normal short-term loan benchmark methodology. Id. at 10.

According to Commerce, its regulations further required it to use "comparable" short-term loans that HYSCO received from commercial lenders as benchmarks. Id. Because the KEXIM loans were variable rate loans, Commerce stated that it would exclude all non-variable rate short-term commercial loans from the benchmark calculation used in the preliminary results. Id. Specifically, according to Commerce, it

> used the variable rate loans provided by commercial banks during 2008 to determine our weighted-average commercial benchmark and compared that benchmark rate to the interest rate charged on the KEXIM loans. To determine the benefit from the KEXIM loan{s}, we then compared the amount of actual interest paid on the KEXIM loan to the amount HYSCO should have paid at the commercial benchmark.

Id. at 11. Commerce thus appeared to agree with U.S. Steel's argument that the weighted average of the actual interest rates charged by commercial lenders on the short-term variable rate commercial loans that HYSCO took out in 2008 should form the basis for the interest rate benchmark. Id.

However, Commerce went on to reject as benchmarks the actual interest rates paid by HYSCO on the variable rate commercial loans that it took out in 2008 at the same time as the KEXIM loans. Instead, Commerce constructed an artificial benchmark interest rate.

Specifically, Commerce first identified certain components of the commercial loans in question –

i.e., the [                    ] "interest rate spread" and [                         ] – and added these

components to a "base rate" comprised of [



                                ]. Id. at 10-11; The Department's Memorandum Re: Final

Results Calculations for HYSCO (Feb. 27, 2012) ("Final Calculation Memo") at Attachment B, p.

6 ("Short-Term Benchmark Calculation") (C.R. 2.20-2.21); see also HYSCO Jan. 11, 2012 Loan

Benchmark Response at 1-5 (C.R. 2.17).  Commerce then applied the resulting rates to the

amount of each short-term commercial loan that HYSCO reported taking out in 2008 from

[                            ] to estimate a weighted-average "interest rate" for each month of the

2009 POR in which HYSCO made a payment on the KEXIM loans.  Final Calculation Memo at

Attachment B, p. 6 (C.R. 2.20-2.21); HYSCO Jan. 11, 2012 Loan Benchmark Response at 1

(C.R. 2.17).

Commerce asserted that the resulting figures reflected the interest rates that HYSCO

would have paid "[

                                ]." Final IDM at 10-11 (2.39); Final

Calculation Memo at Attachment B, p. 6 (C.R. 2.20-2.21).  [                    ] Commerce's loan

benchmarks represented purely artificial loans that it constructed, not the interest rates charged

on loans that HYSCO – or any other company – actually obtained or could have obtained from

commercial lenders in Korea.

Solely as a result of the change in Commerce's loan benchmark calculation, HYSCO's *ad*

*valorem* subsidy rate for the KEXIM short-term export financing loan subsidy dropped from 0.09

percent to 0.03 percent.  Final IDM at 3 (P.R. 2.40).  Consequently, HYSCO's total *ad valorem*

subsidy rate fell below the 0.50 percent *de minimis* threshold.  <u>Final Results</u>, 77 Fed. Reg. at

13094.  This appeal followed.

## III.    STANDARD OF REVIEW

This Court must overturn a determination by Commerce if it is "unsupported by

substantial evidence on the record, or otherwise not in accordance with the law." 19 U.S.C. §

1516a(b)(1)(B)(1) (2004).  Substantial evidence is "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." <u>Nippon Steel Corp. v. United States</u>, 337

F.3d 1373, 1379 (Fed. Cir. 2003) (quoting <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197 (1938)).

"The substantiality of evidence must take into account whatever in the record fairly detracts from

its weight." <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951).  "Commerce's

findings must be reached by reasoned decision-making, including an examination of the relevant

data and a reasoned explanation supported by a stated connection between the facts found and

the choice made." <u>WelCom Products, Inc. v. United States</u>, CIT Slip Op. 12-124 (Ct. Int'l Trade

Sept. 27, 2012) ("<u>WelCom</u>") (internal citations and quotations omitted).  Indeed "it is well-

established that Commerce's total failure to consider or discuss evidence which, on its face,

provides significant support for an alternative conclusion renders the Department's determination

unsupported by substantial evidence." <u>Allegheny Ludlum Corp. v. United States</u>, 112 F. Supp.

2d 1141, 1165 (Ct. Int'l Trade 2000) ("<u>Allegheny</u>").

To determine whether Commerce's interpretation and application of the countervailing

duty statute "is in accordance with the law," the Court must conduct the two-step analysis

articulated by the Supreme Court in <u>Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467

U.S. 837, 842-43 (1984) ("<u>Chevron</u>").  Under the first step of the <u>Chevron</u> analysis, the Court

must ascertain "whether Congress has directly spoken to the precise question at issue.  If the

intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Wheatland Tube Co. v. United States, 495 F.3d 1355, 1359 (Fed. Cir. 2007) (citing Chevron, 467 U.S. at 843).

The court reaches the second step of the Chevron analysis only "if the statute is silent or ambiguous with respect to the specific issue." Id. In such cases, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." Chevron, 467 U.S. at 843. The agency must not, however, "contravene or ignore the intent of the legislature or the guiding purpose of the statute." Usinor Sacilor v. United States, 893 F. Supp. 1112, 1120-1121 (Ct. Int'l Trade 1995) ("Usinor") (quoting Ceramica Regiomontana, S.A. v. United States, 636 F. Supp. 961, 966 (Ct. Int'l Trade 1986)). Only if "the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence on the record supporting the agency's conclusions" will the Court find the agency's determination to be in accordance with law. Id. Moreover, an agency is bound by the terms of its own regulations, and the failure to follow the requirements of those regulations will render the agency's determination not in accordance with law. Amanda Foods (Vietnam) Ltd. v. United States, 807 F. Supp. 2d 1332, 1342 (Ct. Int'l Trade 2011) (citing United States v. Nixon, 418 U.S. 683, 696 (1974); Vitarelli v. Seaton, 359 U.S. 535, 539-40 (1959); Service v. Dulles, 354 U.S. 363, 388 (1957)).

## IV.   ARGUMENT

### A.   Summary of Argument

This case presents the straightforward but important question of whether Commerce properly complied with the terms of the statute and its own regulations and practice when it determined the benchmark interest rate that it used to measure the countervailable benefit to

HYSCO from the short-term export financing loans provided by the GOK under the KEXIM loan program. The statute mandates that in determining the benefit from a government-provided loan, Commerce must use as its loan benchmark the interest rate of a loan that the respondent "could actually obtain on the market" at the time it received the loan from the government. In its regulations governing the benchmark for short-term loans, Commerce has implemented this requirement by establishing a two-tier hierarchy. Specifically, Commerce will first seek to use as its benchmark the interest rates charged on comparable loans that the respondent actually received during the relevant time period from commercial lenders. Where such actual loans are not available, Commerce will next look to the national average of the interest rates charged on comparable loans by commercial lenders. This is precisely the methodology that Commerce has followed with respect to the benchmark for the KEXIM loans in every prior administrative review in this case.

For the Final Results at issue here, however, Commerce constructed an artificial loan benchmark. This benchmark did not represent the interest rate of commercial loans that HYSCO – or any other company – could actually obtain on the market and hence failed to comply with the requirements of the statute. Moreover, in choosing to construct a loan benchmark where the interest rates of comparable short-term loans that HYSCO actually received at the same time as the KEXIM loans as well as national average interest rates were available on the record, Commerce failed to comply with the two-tier hierarchy established by its regulations. The result was that Commerce chose an artificial loan benchmark that was demonstrably less accurate and distortive and failed to account for the factors that actually determined commercial interest rates in Korea during the relevant time period. For all of these reasons, Commerce's determination of the benefit to HYSCO from the KEXIM loans is not supported by substantial evidence and is

otherwise not in accordance with law.  It should be overturned.

**B.      The Department Failed To Comply With The Statute And Its Regulations When It Used An Artificial Loan Benchmark To Measure The Benefit To HYSCO From The KEXIM Loans Where Actual Rates For Comparable Commercial Loans Were Available**

In the Final Results, Commerce recognized that it should use the interest rates of comparable variable rate short-term loans taken out by HYSCO in 2008 as the benchmark to measure the benefit from the KEXIM loans that HYSCO also took out in 2008.  Such rates were available because HYSCO reported them in its responses to multiple supplemental questionnaires issued by Commerce.  Nonetheless, Commerce failed to use these rates.  Nor did Commerce use the national average interest rates for short-term commercial loans that were available on the record.  Instead, Commerce constructed benchmark interest rates that were artificial and distortive and did not reflect the commercial borrowing experience of HYSCO or any other borrower during the relevant period.  Commerce's use of these constructed and artificial interest rates was contrary to the terms of the statute and Commerce's own regulations and practice, including Commerce's practice with respect to the benchmark interest rate for KEXIM loans in every prior administrative review in this case.

The countervailing duty statute provides that a countervailable benefit is conferred by a subsidy where there is a benefit to the recipient. 19 U.S.C. § 1677(5)(E) (2006).  In the case of a loan provided by a foreign government, the statute provides that there is a benefit to the recipient where the amount of interest paid on the government loan is less than the interest that "the recipient would pay on a comparable commercial loan that the recipient *could actually obtain* on the market." Id. § 1677(5)(E)(ii) (emphasis added).  The statute thus specifies that the benefit from a government loan is to be measured by the terms of comparable loans that the respondent could actually secure on the market at the time that it obtained the government loan in question.

As Commerce has emphasized, it is therefore vital under the statute that "a comparable commercial loan used as a benchmark should represent a financial instrument that is similar to the government-provided loan and that was taken out (or could have been taken out) at the same point in time." Countervailing Duties, 62 Fed. Reg. 8818, 8829 (Dep't Commerce Feb. 26, 1997) (proposed rule) unchanged in Countervailing Duties: Final Rule, 63 Fed. Reg. 65348, 65364 (Dep't Commerce Nov. 25, 1998) (final rule) ("Preamble").

Commerce's regulations implement the terms of the statute by adopting a two-tier hierarchy to identify short-term loan benchmarks. 19 C.F.R. § 351.505 (2012); Preamble, 63 Fed. Reg. at 65363. Specifically, Section 351.505(a)(3)(i) of the regulations provides that Commerce "normally will rely on the actual experience of the firm in question in obtaining comparable commercial loans." 19 C.F.R. § 351.505(a)(3)(i). As Commerce has explained, such "company-specific benchmarks provide a more accurate measure of the benefit, if any, to a recipient of a government-provided short-term loan" than alternative interest rates. Preamble, 63 Fed. Reg. at 65363.

Where actual commercial loans are not available, Section 351.505(a)(3)(ii) of the regulations establishes that Commerce is to look to the national average interest rates for comparable short-term loans that were taken out at the same time as the government loans. 19 C.F.R. § 351.505(a)(3)(ii). Consequently, the Department will "normally . . . use national averages only in the event that the {respondent} did not take out any comparable commercial loans during the relevant period." Preamble, 63 Fed. Reg. at 65363.

This two-tier hierarchy reflects the basic and common-sense principle that the benefit from a government-provided loan should be measured in relation to what other alternative financing was available to – and could actually be obtained by – the recipient of the government

loan at the time it received the government loan. See 19 C.F.R. § 351.505(a)(3). Significantly, there is no provision in the regulations for the Department to use a constructed loan benchmark rate where actual or national average interest rates are available for comparable commercial loans. See id. Moreover, while it is possible that Commerce may be forced to rely on alternative sources of loan benchmarks where the interest rates from actual loans or national average rates are not available or do not reflect market-determined interest rates, there is no provision in the regulations for Commerce to do so where interest rates meeting the requirements of at least one of the two tiers in Commerce's loan benchmark hierarchy are available. See id. and Preamble, 63 Fed. Reg. at 65364.

Accordingly, the Department's consistent practice in each of the prior administrative reviews of the CVD order in this case has been to use the interest rates of actual short-term loans that the Korean respondents received from commercial lenders in the same year that the KEXIM loans were taken out. See 2004 POR Prelim., 71 Fed. Reg. at 53414, unchanged in 2004 POR Final, 72 Fed. Reg. 119; 2005 POR Prelim., 72 Fed. Reg. at 51603, unchanged in 2005 POR Final, 73 Fed. Reg. 2444; 2006 POR Prelim., 73 Fed. Reg. at 52316, unchanged in 2006 POR Final, 74 Fed. Reg. 2512; 2007 POR Prelim., 74 Fed. Reg. at 46101, unchanged in 2007 POR Final, 4 Fed. Reg. 55192; 2008 POR Prelim., 75 Fed. Reg. at 55746-55747, unchanged in 2008 POR Final, 76 Fed. Reg. 3613. Where the respondent in question did not have any such loans, the Department has used a national average rate. See 2004 POR Prelim., 71 Fed. Reg. at 53414, unchanged in 2004 POR Final, 72 Fed. Reg. 119; 2005 POR Prelim., 72 Fed. Reg. at 51603 (prelim. results) unchanged in 2005 POR Final, 73 Fed. Reg. 2444; 2006 POR Prelim., 73 Fed. Reg. at 52316, unchanged in 2006 POR Final, 74 Fed. Reg. 2512; 2007 POR Prelim., 74 Fed. Reg. at 46101, unchanged in 2007 POR Final, 4 Fed. Reg. 55192; 2008 POR Prelim., 75 Fed.

17

Reg. at 55746-55747, unchanged in 2008 POR Final, 76 Fed. Reg. 3613.  Prior to the instant

review, Commerce has never constructed a short-term interest rate benchmark.

In this case, Commerce had actual rates for comparable short-term loans that HYSCO

received from commercial lenders at the same time as the KEXIM loans.  Specifically, [      ] the

[                             ] loans that HYSCO reported receiving [




].  See HYSCO Dec. 2, 2011 Supplemental Response at 1 and

Exhibit K-8 (C.R. 2.13).  Commerce extensively investigated the details of these loans through

multiple supplemental questionnaires and had more than sufficient information to use the

weighted average interest rates of these loans as its benchmark, consistent with the terms of the

statute and the Department's regulations and practice.  Indeed, Commerce itself appeared to

acknowledge that such rates should be used as the benchmark when it stated in the Final Results

that it had "recalculated the benchmark to only include commercial variable-rate short-term loans

taken out by HYSCO in 2008."  Final IDM at 11 (P.R. 2.40).  Commerce's failure to use such

rates where they were available violated Section 351.505(a)(3)(i) of its regulations.  See 19

C.F.R. § 351.505(a)(3)(i).  Moreover, Commerce's construction of an artificial loan benchmark

where actual rates were available was inaccurate and failed to comply with the statute and the

Department's regulations because the artificial benchmark did not reflect interest rates that

HYSCO or any other borrower could actually obtain on the market at the time the KEXIM loans

were taken out.  19 U.S.C. § 1677(5)(E)(ii); 19 C.F.R. § 351.505(a)(3).

Commerce's error is compounded by its complete failure to explain the basis for its

decision to reject the actual interest rates charged on HYSCO's variable rate short-term loans

NON-CONFIDENTIAL

from commercial lenders in favor of a constructed and artificial loan benchmark. See Final IDM at 10-11 (P.R. 2.40); Allegheny, 112 F. Supp. 2d at 1165; WelCom, Slip Op. 12-124 at 7-8. Specifically, although Commerce noted that it used "the interest rate spread determined by commercial banks" as the basis for one component of the constructed loan benchmark, that statement does not in any way explain why a constructed loan benchmark was necessary or preferable where Commerce had rates from actual loans available to it. See Final IDM at 11 (P.R. 2.40).

Even assuming that Commerce had articulated a valid basis for rejecting the [

] loans as benchmarks – which it did not – Commerce's choice of an artificial loan benchmark was nonetheless erroneous because Commerce had a preferable alternative in the form of national average rates for short-term loans in Korea. See GOK Response to the Department's CVD Questionnaire (Dec. 15, 2010) at Exhibits J-1 and J-4 (P.R. 1.18). Use of these rates would have been consistent with Section 351.505(a)(3)(ii) of the Department's regulations, which provide that where the respondent "did not take out any comparable short-term loans," Commerce "may use a national average rate for comparable commercial loans." 19 C.F.R. § 351.505(a)(3)(ii). As established above, the Department's regulations and the Preamble to the regulations make clear that national average rates are the preferred alternative where company-specific rates are not available, and the Department has used such rates in every prior administrative review in this case where it did not have rates from actual company-specific loans.

In sum, the Department had two sources of loan interest rates that fully complied with the requirements of the statute and its regulations – i.e., (i) the interest rates charged on comparable short-term loans that HYSCO actually obtained on the market at the same time as the KEXIM loans and (ii) national average interest rates for short-term loans from commercial lenders in

Korea (either on a 2008 annual average or monthly average basis).  Each of these sources fully

complied with the requirements of the statute and the Department's regulations as well as the

Department's practice in every administrative review of the CVD order in this case.  Moreover,

each accurately reflected the actual borrowing experience of HYSCO and other companies in

Korea at the time the KEXIM loans were taken out.  As such, the Department's decision to

construct an artificial loan benchmark is unsupported by substantial evidence and otherwise not

in accordance with law.  It should, therefore, be overturned.

## V.    CONCLUSION

For the foregoing reasons, the Court should overturn the Department's determination of

the benefit to HYSCO from the short-term export financing loans provided by the GOK.


Respectfully submitted,

Robert E. Lighthizer
Jeffrey D. Gerrish
Nathaniel B. Bolin

SKADDEN, ARPS, SLATE
 MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7000

On behalf of United States Steel Corporation

Dated: October 26, 2012