# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE R. KENTON MUSGRAVE

|  |  |
|---|---|
| UNITED STATES STEEL CORPORATION ) | |
| ) | |
| Plaintiff, ) | Ct. No. 12-00070 |
| ) | |
| v. ) | **NON-CONFIDENTIAL** |
| ) | **VERSION** |
| UNITED STATES ) | |
| ) | |
| Defendant, ) | |
| and ) | |
| ) | |
| HYUNDAI HYSCO LTD., ) | |
| ) | |
| Defendant-Intervenor. ) | |

## HYUNDAI HYSCO LTD.'S BRIEF IN OPPOSITION TO THE MOTION OF PLAINTIFF U.S. STEEL CORPORATION FOR JUDGMENT UPON THE AGENCY RECORD

Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Brady W. Mills
Mary S. Hodgins
Jeffrey O. Frank

**MORRIS, MANNING & MARTIN LLP**

1333 H Street, N.W., Suite 820E
Washington, D.C. 20005
(202) 408-5153

*Counsel to HYSCO*

March 25, 2013

### TABLE OF CONTENTS

I.   ADMINISTRATIVE DETERMINATION UNDER REVIEW ............................ 1

II.  ISSUE PRESENTED FOR REVIEW ................................................................ 2

III. STATEMENT OF FACTS ............................................................................... 2

IV.  STANDARD OF REVIEW .............................................................................. 4

V.   SUMMARY OF ARGUMENT ........................................................................ 5

VI.  ARGUMENT ................................................................................................... 8

    A.   The Short-Term Loan Benchmark Used By Commerce Was Fully
        Consistent With The Statute And Its Regulations. ................................... 8

    B.   U.S. Steel's Arguments That Commerce's Benchmark Was Unlawful Are
        Unpersuasive. ........................................................................................ 11

VII. CONCLUSION AND RELIEF REQUESTED .................................................. 16

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bowman Transp. Inc. v. Arkansas-Best Freight Sys., Inc.,*
  419 U.S. 281 (1974)................................................................................................5

*Cathedral Candle Co. v. United States,*
  400 F.3d 1352 (Fed. Cir. 2005)............................................................................16

*Chevron U.S.A. Inc. v. Natural Res. Def. Council,*
  467 U.S. 837 (1984)................................................................................................5

*Consol. Edison Co. of NY v. Nat'l Labor Relations Bd.,*
  305 U.S. 197 (1938)................................................................................................4

*Fujian Lianfu Forestry Co., Ltd. v. United States,*
  638 F. Supp.2d 1325 (Ct. Int'l Trade 2009) ........................................................15

*Matsushita Elec. Indus. Co., Ltd. v. United States,*
  750 F.2d 927 (Fed. Cir. 1984)................................................................................5

*MTZ Polyfilms Ltd. v. United States,*
  659 F. Supp.2d 1303 (Ct. Int'l Trade 2009) ........................................................15

*Rhone Poulenc, Inc. v. United States,*
  899 F.2d 1185 (Fed. Cir. 1990)............................................................................10

*SeAH Steel Corp. v. United States,*
  704 F. Supp. 2d 1353 (Ct. Int'l Trade 2010) .......................................................12

*Thomas Jefferson Univ. v. Shalala,*
  512 U.S. 504 (1994)................................................................................................5

**Regulations**

19 C.F.R. § 351.505(a)(2)....................................................................................9, 15

19 C.F.R. § 351.505(a)(3)....................................................................................9, 11, 12, 15

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)....................................................................................4

19 U.S.C. § 1677(5)(E)(ii)......................................................................................6, 8

**Administrative Determinations/Other Authorities**

*Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea*: Final Results of
    Countervailing Duty Administrative Review, 77 Fed. Reg. 13,093 (March 5, 2012)...........1, 4

*Countervailing Duties*, 62 Fed. Reg. 8818 (Dep't Commerce Feb. 26, 1997) ..............................15

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE R. KENTON MUSGRAVE

| | | |
|---|---|---|
| UNITED STATES STEEL CORPORATION | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Ct. No. 12-00070 |
| v. | ) | |
| | ) | |
| UNITED STATES | ) | |
| | ) | |
| Defendant, | ) | |
| and | ) | |
| | ) | |
| HYUNDAI HYSCO LTD., | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

BRIEF IN OPPOSITION TO THE MOTION OF PLAINTIFF
U.S. STEEL CORPORATION FOR JUDGMENT
UPON THE AGENCY RECORD

In accordance with Rule 56.2 of the Rules of this Court, and the Scheduling Order

entered by this Court on June 5, 2012, as amended on January 28, 2013, Defendant-

Intervenor Hyundai HYSCO Ltd. ("HYSCO") files this brief in opposition to the Rule

56.2 Motion for Judgment upon the Agency Record filed by Plaintiff U.S. Steel

Corporation ("U.S. Steel Br.").

I.      **ADMINISTRATIVE DETERMINATION UNDER REVIEW**

The administrative determination under review in this action is *Corrosion-*

*Resistant Carbon Steel Flat Products from the Republic of Korea: Final Results of*

*Countervailing Duty Administrative Review*, 77 Fed. Reg. 13,093 (March 5, 2012)

("*Final Results*") (PR Doc. 2-49), Issues and Decision Memorandum ("IDM"), PR Doc. 2-40.[1]

## II.   ISSUE PRESENTED FOR REVIEW

Whether the U.S. Department of Commerce's ("Commerce") use of the interest rate formula contained in HYSCO's variable rate loans that were taken out in 2008 from commercial lenders as the basis for the benchmark used for measuring the countervailable benefit HYSCO received from short-term variable rate export loans that were taken out from the government-owned Korean Export Import Bank ("KEXIM") in 2008 was supported by substantial evidence and otherwise in accordance with law.

## III.   STATEMENT OF FACTS

HYSCO does not disagree with the statement of facts as set forth in U.S. Steel's brief, with the exception of the following:

Page 4: U.S. Steel states that "Commerce sought and received information from HYSCO concerning the short-term loans that HYSCO received from commercial lenders during 2008 and 2009." U.S. Steel Br. at 4. Although HYSCO agrees with this factual statement, the record evidence cited by U.S. Steel inadvertently omits a reference to the record document in which the 2008 short-term loan information was provided by HYSCO. That information was provided in HYSCO's March 17, 2011 supplemental response at Exhibit K-6. CR Doc. 1-8 at Exhibit K-6.

---

[1] The confidential and public administrative records in this case consist of two confidential parts and two public parts. Accordingly, references to the confidential administrative record are designated as "CR Doc. 1" or "2" with the numerical reference being to the part of the record cited, followed by the document number (*e.g.*, CR Doc. 1-2). References to the public record follow the same convention but begin with "PR Doc." (*e.g.*, PR Doc. 1-2).

NON-CONFIDENTIAL

Page 7: U.S. Steel states that the spread charged on HYSCO's variable rate loans that were used as the benchmark for measuring the benefit from HYSCO's KEXIM loans "was determined based on [

].'' U.S. Steel Br. at 7.  However, the record evidence cited as support – HYSCO's January 11, 2012 supplemental response at 2-4 (CR Doc. 2-17 at 2-4) – does not support this statement.  The only question in that response that directly addresses the spread is Question 2.D in which Commerce asked HYSCO why two different spreads applied to this [          ] loan.  *See* CR Doc. 2-17 at 4.  In response, HYSCO explained that the spread on the [          ] loan was revised following an extension of the maturity date of the loan.  *Id.*  HYSCO also confirmed that "the different loan spreads are not based on the number of days the loan is outstanding."  *Id.*  Nowhere in this response did HYSCO specifically describe the factors that were considered by [

] in determining the appropriate spread to charge on the short-term loans.  There is thus no factual support for U.S. Steel's statement that the spread on this [          ] loan was based on the [

].

Pages 7-8: U.S. Steel makes similar factual claims about the spread on the [          ] loan, and cites to the same source documents.  U.S. Steel Br. at 7-8.  For the same reasons discussed above, U.S. Steel's factual claims about how the spread on this loan was established by the bank are not substantiated by the record evidence U.S. Steel cites.

3

NON-CONFIDENTIAL

Pages 10-11: U.S. Steel makes the factual claim that "Commerce constructed an artificial benchmark interest rate" (U.S. Steel Br. at 10) and "Commerce's loan benchmarks represented purely artificial loans that it constructed, not the interest rates charged on loans that HYSCO – or any other company – actually obtained or could have obtained from commercial lenders in Korea." U.S. Steel Br. at 11. These are not factual statements that are supported by the record but are instead U.S. Steel's characterizations of Commerce's benchmark interest rate. The record evidence shows that Commerce's benchmark interest rate was based on a formula taken directly from HYSCO's loan agreements with [                                    ] that reflected the interest rates HYSCO would have paid had these loans extended into {2009} and been paid on the same date as the countervailable KEXIM loans. See CR Doc. 2-22 at Attachment B, page 6; PR Doc. 2-40 at 10-11. There is thus nothing "artificial" about the benchmark used by Commerce. As Commerce stated in the *Final Results*, "the record, in fact, contains short-term variable interest rates for comparable commercial loans the terms of which were established during the same year as the KEXIM loans in question." PR Doc. 2-40 at 11. It was the interest rate formula from these loans that was used for the benchmark interest rates, and not an "artificial" interest rate as alleged by U.S. Steel.

## IV.   **STANDARD OF REVIEW**

In reviewing a challenge to Commerce's determination in a countervailing duty administrative review, the Court "shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record or otherwise not in accordance with the law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of NY v. Nat'l Labor Relations Bd.,* 305 U.S.

197, 229 (1938); *accord Matsushita Elec. Indus. Co., Ltd. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).

Commerce's interpretation of the countervailing duty statute is reviewed pursuant to the standard set out in *Chevron U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 843 (1984). First, the court must determine whether Congress has directly spoken to the precise question at issue. *Id.* The court, as well as the agency, must give effect to the unambiguously expressed intent of Congress and therefore, if the intent of Congress is clear, "that is the end of the matter." *Id.* If, however, the court determines that the statute is silent or ambiguous, the court does not simply impose its own construction on the statute. Instead, the court must assess whether the agency's interpretation of the statute is reasonable. *See id.*

When reviewing Commerce's interpretation of its regulations, this Court's "task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (*quoting Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)). The Court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp. Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

## V.    SUMMARY OF ARGUMENT

In 2008, HYSCO took out short-term export loans from the government-owned Korean Export/Import Bank (the "KEXIM loans"). These KEXIM loans were variable interest rate loans in which the interest rate for payments that were made during the 2009 period of review ("POR") were based on a formula set out in the 2008 loan agreement

NON-CONFIDENTIAL

between HYSCO and the KEXIM that consisted of a base rate and a spread. *See* CR

Doc. 1-3 at Exhibit K-2. The spread was fixed, but the base rate varied because it was

tied to the [                                                          ]. *See* CR Doc. 2-

17 at 4-5. Thus, the actual interest payments that were made in the 2009 POR varied

based on the actual [            ] rate in the month the interest payment was made.

Commerce determined that these KEXIM loans were a financial contribution provided by

the government and thus had to select benchmark loans that could be compared to the

KEXIM loans to determine the amount of the countervailable benefit, if any. *See, e.g.,*

PR Doc. 2-40 at 9-10.

     In choosing a benchmark, Commerce followed the statute's direction that it

normally select the loan benchmark using "comparable commercial loan{s} that the

recipient could actually obtain on the market." 19 U.S.C. § 1677(5)(E)(ii). Specifically,

Commerce selected HYSCO's loans from two commercial banks – [

] – because they contained "short-term variable interest rates for comparable

commercial loans the terms of which were established during the same year as the

KEXIM loans in question." PR Doc. 2-40 at 11. These benchmark loans had been taken

out by HYSCO in 2008 and, like the KEXIM loans, were variable rate loans with the

interest rate established based on a formula consisting of a base rate and a spread.[2]

     The only rub, and the basis for U.S. Steel's appeal, stems from the fact that the

interest payments that HYSCO made on the [                          ] benchmark loans

did not extend into the months of the 2009 POR when the interest payments were made

on the countervailable KEXIM variable-rate loans. Commerce thus used the interest rate

---

[2] In the case of the [        ] loan the interest rate also included a [                          ].
*See* CR Doc. 2-13 at Exhibit K-8; CR Doc. 2-17 at 2.

NON-CONFIDENTIAL

formula contained in the [                         ] benchmark loans as the basis for

determining the interest rate that would have been paid had HYSCO made interest

payments on these loans in the same months in 2009 as the interest payments it made on

the KEXIM variable rate loans. *See* CR Doc. 2-22 at Attachment B, page 6. In this way,

Commerce used a benchmark that was based on loans that HYSCO had actually taken out

at the same time as the KEXIM loans (*i.e.*, 2008) but which also was contemporaneous

with interest rates at the time HYSCO actually made interest payments on the KEXIM

loans in the 2009 POR.

U.S. Steel argues that the benchmark interest rates used by Commerce are

"artificial" and do not comply with the statute or regulations because they were

calculated using the formula in the benchmark loan agreements (base rate and spreads)

and were not actual rates that HYSCO paid on these loans in 2009. U.S. Steel Br. at 18.

But there is nothing "artificial" about the benchmark interest rates that Commerce used.

The benchmark interest rate used is based on the interest rate formula set out in the loan

agreement that HYSCO took out at the same time as the KEXIM loans. It thus reflects a

directly comparable interest rate that HYSCO actually obtained in the market at the same

time it received the KEXIM loans. The benchmark also fully comports with the statute

and regulations because it is based on HYSCO's actual commercial loans that have terms

that are comparable to those of the KEXIM loans, *i.e.*, short-term variable rate Korean

won loans taken out in 2008. Finally, the benchmark comports with Commerce's legal

obligation to calculate margins as accurately as possible because it is contemporaneous

with the interest rates that HYSCO actually paid on the KEXIM loans in the 2009 POR.

VI.   **ARGUMENT**

    A.   **The Short-Term Loan Benchmark Used By Commerce Was Fully Consistent With The Statute And Its Regulations.**

Although the statute does not mandate the benchmark interest rate to be used in measuring the benefit from a countervailable short-term loan, it does provide that:

> A benefit shall normally be treated as conferred where there is a benefit to the recipient, including –
>
> (ii) in the case of a loan, if there is a difference between the amount the recipient of the loan pays on the loan and the amount the recipient would pay on a comparable commercial loan that the recipient could actually obtain on the market.

19 U.S.C. § 1677(5)(E)(ii). The statute thus provides that a benefit from a short-term loan normally will exist if there is a difference in the amount the recipient pays on the loan and what the recipient would pay on a "comparable commercial loan" that the recipient "could actually obtain on the market."

These terms are not defined in the statute, but Commerce has filled that gap by promulgating regulations that define these terms. "Comparable commercial loan" is defined in the regulations as follows:

> (2) *"Comparable commercial loan" defined* – (i) *"Comparable" defined.* In selecting a loan that is "comparable" to the government-provided loan, the Secretary normally will place primary emphasis on similarities in the structure of the loans (*e.g.*, fixed interest rate v. variable interest rate), the maturity of the loans (*e.g.*, short-term v. long-term), and the currency in which the loans are denominated.
>
> (ii) *"Commercial" defined.* In selecting a "commercial" loan, the Secretary normally will use a loan taken out by a firm from a commercial lending institution or a debt instrument issued by a firm in a commercial market. . . .
>
> (iv) *Short-term loans.* In making the comparison required under paragraph (a)(1) of this section, if the government-provided loan is a short-term loan, the Secretary normally will use an annual average of the interest rates on comparable commercial loans during the year in which

NON-CONFIDENTIAL

the government-provided loan was taken out, weighted by the principal amount of each loan. However, if the Secretary finds that interest rates fluctuated significantly during the period of . . . review, the Secretary will use the most appropriate interest rate based on the circumstances presented.

19 C.F.R. § 351.505(a)(2)(i), (ii) and (iv).

The regulation also defines what constitutes a loan that a recipient "could actually obtain on the market":

> (3) *"Could actually obtain on the market" defined.* (i) *In general.* In selecting a comparable commercial loan that the recipient "could actually obtain on the market," the Secretary normally will rely on the actual experience of the firm in question in obtaining comparable commercial loans for both short-term and long-term loans.
>
> (ii) *Where the firm has no comparable commercial loans.* If the firm did not take out any comparable commercial loans during the period referred to in paragraph (a)(2)(iii) or (a)(2)(iv) of this section, the Secretary may use a national average interest rate for comparable commercial loans.

19 C.F.R. § 351.505(a)(3)(i), (ii).

Taken together the statute and regulations provide that Commerce "normally" shall select benchmark <u>loans</u>: (1) with similar structures (fixed versus variable), similar maturities (short versus long-term), and similar currencies, and (2) that were actually taken out by the firm in question from a commercial lending institution in the same year that the government-provided loan was taken out.

The benchmark loans selected by Commerce were fully consistent with the statute and regulations. First, the [                    ] loans had identical structures as the KEXIM loans because they were variable rate, short-term loans that were denominated in Korean won. *Compare* CR Doc. 1-3 at Exhibit K-2 (KEXIM loan contract) *with* CR Doc. 2-13 at Exhibit K-8 ([                    ] loan contracts). Second, the benchmark loans were actually taken out by HYSCO from two commercial lenders –

NON-CONFIDENTIAL

[                        ] – in the same year that the government-provided KEXIM loans

were taken out – 2008.  *See id.*  This is all the statute and regulations contemplate.  In

fact, the benchmark selected by Commerce meets the requirements to the letter.

The benchmark selected by Commerce was also the most appropriate one to

assure that Commerce adhered to its legal obligation to calculate margins as accurately as

possible.  *See, e.g., Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir.

1990).  Specifically, the KEXIM loans are variable rate loans and thus the

countervailable benefit was calculated as the difference between the amount of interest

HYSCO paid on those loans in 2009 and what HYSCO would have paid on comparable

benchmark loans.  *See* CR Doc. 2-22; PR Doc. 2-40 at 11.  Commerce thus used a

benchmark interest rate that was contemporaneous with the interest rate that existed at the

time HYSCO made interest payments on the KEXIM loans in 2009.  However, because

HYSCO had not made interest payments on these loans in the same months in 2009 as

the KEXIM loans, Commerce used the interest rate formula from those [

] loans as the basis for determining the variable interest rate that would have

applied in 2009 at the time interest payments were made on the KEXIM loans.  *See id.*

Had Commerce used the interest rates on the [                        ] loans that

were paid in 2008 it would have been comparing variable interest rates set in *2008* with

variable interest rates paid on the KEXIM loans in *2009*.  Given the fact that interest rates

declined significantly between 2008 and 2009 (*compare* CR Doc. 1-8 at Exhibit K-6

(showing 2008 interest rate of [      ]%) *with* CR Doc. 2-1 at Exhibit K-7 (showing 2009

interest rate of [      ]%), the use of the 2008 interest rate to calculate the benefits from

interest payments made in 2009 would have overstated the benefit and resulted in a less

NON-CONFIDENTIAL

accurate benefit calculation.  Commerce's selection of the benchmark interest rate was thus the most reasonable and non-distortive benchmark and was fully consistent with the statute and regulations.

**B.   U.S. Steel's Arguments That Commerce's Benchmark Was Unlawful Are Unpersuasive.**

U.S. Steel makes a number of arguments against Commerce's benchmark, none of which are persuasive.  First, U.S. Steel argues that Commerce's failure to use the actual interest rates that HYSCO paid on the [                              ] loans in 2008 "violated Section 351.505(a)(3)(i) of its regulations."  U.S. Steel Br. at 18.  This argument is based on a fundamental misreading of this provision.  Section 351.505(a)(3)(i), by its terms, addresses the criteria Commerce should normally follow in selecting a comparable commercial loan that the recipient "could actually obtain on the market" by providing that Commerce should "rely on the actual experience of the firm in question in obtaining comparable commercial loans for both short-term and long-term loans."  The language of the regulation thus focuses on the selection of the loan – and says nothing about how to calculate the interest rate from that loan.  As discussed above, Commerce followed its regulation and relied on HYSCO's actual experience in obtaining loans from [

].  These loans were directly comparable to the KEXIM loans because they were variable rate short-term loans in Korean won that were taken out in 2008 when the KEXIM loans were also taken out.

While U.S. Steel's real complaint is with the interest rate that Commerce calculated using the interest rate formula contained in those benchmark loans, that argument simply cannot be supported by the plain language of section 351.505(a)(3)(i), which does not mandate anything with respect to the interest rate or how it is calculated.

NON-CONFIDENTIAL

And even if the regulation did speak to the actual interest rate that Commerce should normally use, it would not support U.S. Steel's argument. Commerce relied on the actual interest rate formula contained in the benchmark loans that HYSCO received from [

] as the basis for calculating the benchmark interest rate used to measure the benefit from the KEXIM loans. The interest rate was thus based on HYSCO's actual experience, and was set based on market conditions that existed in the same year that HYSCO received the short-term loans from the KEXIM bank (*i.e.*, 2008). In U.S. Steel's words, the interest rate represents the "other alternative financing {that} was available to – and could actually be obtained by – the recipient of the government loan at the time it received the government loan." U.S. Steel Br. at 16-17.

Furthermore, even if the language of section 351.505(a)(3)(i) supported U.S. Steel's argument (which it does not), that regulation only provides that Commerce "<u>normally</u> will rely on the actual experience of the firm in question in obtaining comparable commercial loans for both short-term and long-term loans." It does not say what Commerce "shall" use and thus is not a mandate. Rather, the regulation provides Commerce with discretion to deviate from the "normal" situation in appropriate circumstances. *See, e.g., SeAH Steel Corp. v. United States*, 704 F. Supp. 2d 1353, 1376 (Ct. Int'l Trade 2010) ("Inherent in this authority is the ability to determine where or not the 'normal' situation applies to any given circumstance").

Thus, even *assuming arguendo* that the interest rate that was calculated for these commercial loans is not considered to be based on HYSCO's "actual" experience, the regulations provide Commerce with discretion to calculate the benchmark interest rate from the interest rate formula contained in HYSCO's commercial loans. In this case, it

NON-CONFIDENTIAL

would have been particularly appropriate for Commerce to exercise its discretion to use the interest rate formula in those loans to calculate the benchmark interest rate because interest rates fluctuated significantly between 2008 and 2009.  Using the interest rates that HYSCO paid on its [                              ] loans in 2008 as the benchmark for measuring any benefit from interest payments it made on the KEXIM loans in 2009 would have been distortive and would have overstated the benefit.  *Compare* CR Doc. 1-8 at Exhibit K-6 (showing a weighted-average annual 2008 interest rate of [      ] percent) with CR Doc. 2-1 at Exhibit K-7 (showing a weighted-average annual 2009 interest rate of [      ] percent).

Second, U.S. Steel argues that "Commerce's construction of an artificial loan benchmark where actual rates were available was inaccurate and failed to comply with the statute and the Department's regulations because the artificial benchmark did not reflect interest rates that HYSCO or any other borrower could actually obtain on the market at the time the KEXIM loans were taken out."  U.S. Steel Br. at 18.  This is nonsense.  Commerce did not construct an "artificial" loan benchmark as U.S. Steel pejoratively suggests.  Rather, Commerce used the interest rate formula for the actual commercial loans that HYSCO took out in the same year as it took out its KEXIM loans as the basis for calculating what the applicable interest rate would have been for payments in 2009.  There is nothing "artificial" about these benchmarks as they are based on the interest rate formula established in the [                              ] loans that HYSCO actually obtained from commercial lenders at the same time that the KEXIM loans were taken out.

NON-CONFIDENTIAL

Furthermore, U.S. Steel offers no evidence to substantiate its claim that the benchmark interest rate used by Commerce is "inaccurate." U.S. Steel Br. at 18. To the contrary, as discussed above the evidence shows that had Commerce used the benchmark interest rates suggested by U.S. Steel that benchmark interest rate would have been distortive and would have overstated the benefit from HYSCO's KEXIM loans. Finally, the interest rate used did reflect the interest rate that HYSCO actually obtained on the market at the time the KEXIM loans were taken out. There is no dispute that the [

] loans were taken out in 2008, which is the same year the KEXIM loans were taken out. And the interest rate formula reflected in the loan agreements between these lenders and HYSCO set the terms of how the variable interest rate would be set (base rate and spread).

Third, U.S. Steel argues that "Commerce's error is compounded by its failure to explain the basis for its decision to reject the actual interest rates charged on HYSCO's variable rate short-term loans from commercial lenders in favor of a constructed and artificial loan benchmark." U.S. Steel Br. at 18-19. As discussed, Commerce did not reject the actual interest rates charged to HYSCO but instead used the actual interest rate formula on loans that HYSCO received as the basis for calculating the interest rate that would have applied in 2009 had HYSCO made interest payments on these loans in 2009 contemporaneous with its interest payments on the KEXIM loans. And in response to U.S. Steel's argument that Commerce should not construct an interest rate benchmark, Commerce explained: "we note that the benchmark is calculated using the interest rate spread determined by the commercial banks as reported on HYSCO's actual variable rate short-term loans taken out in 2008." PR Doc. 2-40 at 11. In other words, Commerce

NON-CONFIDENTIAL

rejected U.S. Steel's characterization of the benchmark as "constructed" and explained that it was in fact based on the interest rates on HYSCO's actual variable rate short-term loans taken out in 2008. No more explanation was required as the benchmark fully comported with the statute and regulations. *See* discussion *supra* at 8-11.

Finally, U.S. Steel argues that even if Commerce had articulated a sufficient basis for rejecting the [                    ] loans as benchmarks its choice "was nonetheless erroneous because Commerce had a preferable alternative in the form of national average rates for short-term loans in Korea." U.S. Steel Br. at 19. This argument is off the mark because, as discussed, Commerce did not reject the use of the [                    ] loans as benchmarks. Instead, Commerce used these company-specific loans as its benchmark as preferred by 19 C.F.R. § 351.505(a)(2)(ii) & (3)(i). Because Commerce had comparable loans that HYSCO had taken out in the same year as the KEXIM loans it was unnecessary for Commerce to resort to an alternative benchmark in the form of national average rates for short-term loans in Korea.[3]

Indeed, as Commerce has previously explained the use of company-specific benchmarks "provides a more accurate measure of the benefit, if any, to a recipient of a government-provided short-term loan" than other alternative interest rates such as the national average rates. *See Countervailing Duties*, 62 Fed. Reg. 8,818, 8,829 (Dep't

---

[3] U.S. Steel repeatedly mentions that in prior reviews Commerce measured the benefit from the KEXIM loans by either using the weighted-average interest rates that commercial lenders charged for short-term loans taken out in the same year as the KEXIM loans, or an annual average of national short-term interest rates for the same year. *See* U.S. Steel Br. at 3-4; 14; 17-18; 20. U.S. Steel, however, has not made a specific legal argument about <u>why</u> this establishes that what Commerce did in the current review is unlawful. To the extent this is intended to be a separate legal argument, it is waived. *See, e.g., MTZ Polyfilms Ltd. v. United States*, 659 F. Supp.2d 1303, 1308-09 (Ct. Int'l Trade 2009); *Fujian Lianfu Forestry Co., Ltd. v. United States*, 638 F. Supp.2d 1325, 1349-50 (Ct. Int'l Trade 2009).

Commerce Feb. 26, 1997) (proposed rule).  Commerce's decision to use a company-specific benchmark, instead of an alternative national average benchmark rate was thus reasonable and fully consistent with its regulations.  *See, e.g., Cathedral Candle Co. v. United States*, 400 F.3d 1352, 1363 (Fed. Cir. 2005) ("To begin with, it is well settled that an agency's interpretation of its own regulations is entitled to broad deference from the courts." (citations omitted)).

## VII.    CONCLUSION AND RELIEF REQUESTED

Based on the foregoing, HYSCO respectfully requests that this Court hold that Commerce's use of a contemporaneous short-term loan benchmark in the *Final Results* is supported by substantial evidence and is otherwise in accordance with law.

Respectfully submitted,

/s/ Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Brady W. Mills
Mary S. Hodgins
Jeffrey O. Frank

**MORRIS, MANNING & MARTIN LLP**

1333 H Street, N.W., Suite 820E
Washington, D.C. 20005
(202) 408-5153

*Counsel to HYSCO*

March 25, 2013

## Certificate of Compliance

I hereby certify that the foregoing response brief complies with the Rules of this Court in that it contains 4,693 words including text, footnotes, and headings.

**s/ Brady W. Mills**