**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:     THE HONORABLE R. KENTON MUSGRAVE, SENIOR JUDGE**

| | |
|---|---|
| UNITED STATES STEEL CORPORATION,    ) | |
|                    ) | |
|      Plaintiff,              ) | |
|                    ) | |
|           v.               ) | Court No. 12-0070 |

UNITED STATES STEEL CORPORATION,        )

        Plaintiff,                            )

              v.                               )       Court No. 12-0070

UNITED STATES,                             )

        Defendant,                            )       **NON-CONFIDENTIAL VERSION**

              and                             )       BPI removed from pp. 3-7, 10-11,
                   )       13-15

HYUNDAI HYSCO Ltd.,                        )

        Defendant-Intervenor.                 )

                   )

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S**
**MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

|  | STUART F. DELERY |
|---|---|
|  | Acting Assistant Attorney General |
|  | |
|  | JEANNE E. DAVIDSON |
|  | Director |
|  | |
|  | REGINALD T. BLADES, JR. |
| OF COUNSEL: | Assistant Director |
|  | |
| SAPNA SHARMA | TARA K. HOGAN |
| Attorney | Senior Trial Counsel |
| Office of the Chief Counsel | U.S. Department of Justice |
|    for Import Administration | Commercial Litigation Branch |
| U.S. Department of Commerce | P.O. Box 480 |
|  Washington, D.C. 20230 | Ben Franklin Station |
|  | Washington, D.C. 20044 |
|  | Tel.:  (202) 616-2228 |
|  | Fax:  (202) 305-7643 |
|  | |
| March 25, 2013 | Attorneys for Defendant United States |

# TABLE OF CONTENTS

**PAGE(S)**

STATEMENT PURSUANT TO RULE 56.2 ...................................................................................2

    I.    The Administrative Determination Under Review ...................................................2

    II.    Issue Presented For Review ....................................................................................2

STATEMENT OF FACTS ..............................................................................................................2

SUMMARY OF ARGUMENT ........................................................................................................6

ARGUMENT ...................................................................................................................................7

    I.    Standard Of Review ................................................................................................7

    II.    The Statute And Regulations Require Commerce To Compare Government
            Loans To Comparable Commercial Loans To Calculate Benefit ............................9

    III.    The Benchmark For HYSCO's KEXIM Loans Relied Upon Comparable
            Loans That HYSCO Could Actually Obtain On The Market ................................10

    IV.    Commerce Was Not Required To Use Methodologies From Past Proceedings
            Based Upon A Different Factual Record ...............................................................15

CONCLUSION ...............................................................................................................................17

# TABLE OF AUTHORITIES

## CASES

**PAGE(S)**

*Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*,
400 F.3d 1352 (Fed. Cir. 2005)........................................................................... 8

*Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc.*,
467 U.S. 837 (1984)............................................................................ 8, 12, 16

*Consolo v. Federal Maritime Comm'n*,
383 U.S. 607 (1966)........................................................................................... 8

*Consolidated Edison Co. v. NLRB*,
305 U.S. 197 (1938)........................................................................................... 7

*Fujitsu Gen. Ltd. v. United States*,
88 F.3d 1034 (Fed. Cir. 1996).................................................................... 7, 12

*Koyo Seiko Co. v. United States*,
36 F.3d 1565 (Fed. Cir. 1994)......................................................................... 14

*Lasko Metal Prods, Inc. v. United States*,
43 F.3d 1442 (Fed. Cir. 1994)......................................................................... 16

*Pesquera Mares Australes Ltda. v. United States*,
266 F.3d 1372 (Fed. Cir. 2001)......................................................................... 8

*Royal Thai Gov't v. United States*,
502 F. Supp. 2d 1334 (Ct. Int'l Trade 2007) .................................................... 9

*Shandong Huarong Mach. Co. v. United States*,
29 C.I.T. 484 (2005) ....................................................................................... 15

*SKF USA, Inc. v. United States*,
630 F.3d 1365 (Fed. Cir. 2011)....................................................................... 16

*Thai Pineapple Pub. Co. v. United States*,
187 F.3d 1362 (Fed. Cir. 1999)....................................................................... 12

*Timken Co. v. United States*,
354 F.3d 1334 (Fed. Cir. 2004)......................................................................... 8

*Timken United States Corp. v. United States*,
    421 F.3d 1350 (Fed. Cir. 2005).................................................................... 9

*United States v. Eurodif, S.A.*,
    555 U.S. 305 (2009)................................................................................... 8

## STATUTES AND REGUATIONS

19 U.S.C. § 1516a(b)(1)(B) ......................................................................... 7

19 U.S.C. § 1677(5)(E)(ii) ................................................................... passim

19 C.F.R. § 351.505(a)(2) ........................................................ 9, 10, 13, 14

19 C.F.R. § 351.505(a)(2)(iii)-(iv) ............................................................. 9

19 C.F.R. § 351.505(a)(2)(iv) .................................................... 10, 11, 12, 13

19 C.F.R. § 351.505(a)(3) ......................................................................... 13

19 C.F.R. § 351.505(a)(3)(i) ................................................................ 9, 14

19 C.F.R. § 351.505(a)(3)(ii) ............................................................... 9, 14

## MISCELLANEOUS

*Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea*,
    77 Fed. Reg. 13,093 (Dep't of Commerce Mar. 5, 2012) .......................... 1, 2, 5

*Corrosion-Resistant Carbon Steel Flat Products From the Republic of Korea: Preliminary
Results of Countervailing Duty Administrative Review*,
    76 Fed. Reg. 54,209 (Dep't of Commerce Aug. 31, 2011)............................ 3, 4

*Countervailing Duties: Final Rule*,
    63 Fed. Reg. 65,3483 (Dep't of Commerce Nov. 25, 1998) ......................... 9, 14

*Countervailing Duty Orders and Amendments of Final Affirmative Countervailing Duty
Determinations: Certain Steel Products from Korea*,
    58 Fed. Reg. 43,752 (Dep't of Commerce Aug. 17, 1993)................................ 2

*Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for
Revocation in Part*,
    75 Fed. Reg. 60,076 (Dep't of Commerce Sept. 29, 2010) ................................ 2

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE R. KENTON MUSGRAVE, SENIOR JUDGE

_____

| | |
|---|---|
| UNITED STATES STEEL CORPORATION, ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
|          v. ) | Court No. 12-0070 |
| ) | |
| UNITED STATES, ) | |
| ) | **NON-CONFIDENTIAL VERSION** |
|     Defendant, ) | BPI removed from pp. 3-7, 10-11, |
| ) | 13-15 |
|       and ) | |
| ) | |
| HYUNDAI HYSCO Ltd., ) | |
| ) | |
|     Defendant-Intervenor. ) | |
| _____ ) | |

DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Defendant, the United States, respectfully submits this response to the motion for

judgment upon the agency record filed by plaintiff United States Steel Corporation (U.S. Steel)

challenging the final determination of the Department of Commerce's countervailing duty

administrative review of certain corrosion-resistant carbon steel flat products from the Republic

of Korea. *See Corrosion-Resistant Carbon Steel Flat Products From the Republic of Korea*, 77

Fed. Reg. 13,093 (Dep't of Commerce Mar. 5, 2012) (*Final Results*) (U.S. Steel Appx Tab 24).

As we demonstrate below, Commerce's final determination is supported by substantial

evidence and is otherwise in accordance with law.  Accordingly, we respectfully request that the

Court sustain Commerce's determination and dismiss the plaintiff's complaint.

STATEMENT PURSUANT TO RULE 56.2

I.      The Administrative Determination Under Review

The administrative decision under review is *Corrosion-Resistant Carbon Steel Flat Products From the Republic of Korea*, 77 Fed. Reg. 13,093 (Dep't of Commerce Mar. 5, 2012) (*Final Results*), and accompanying Issues and Decision Memorandum.

II.     Issue Presented For Review

Whether Commerce properly accounted for the variability of interest rates when it constructed the benchmark interest rate to measure the benefit to Hyundai HYSCO Ltd. from the Export-Import Bank of Korea (KEXIM) short-term export financing program.

STATEMENT OF FACTS

On August 17, 1993, Commerce issued the CVD order on certain corrosion-resistant carbon steel flat products from the Republic of Korea. *See Countervailing Duty Orders and Amendments to Final Affirmative Countervailing Duty Determinations:  Certain Steel Products From Korea*, 58 Fed. Reg. 43,752 (Dep't of Commerce Aug. 17, 1993) (*CORE Korea Order*). On September 29, 2010, Commerce initiated a countervailing duty administrative review of this order, covering the period January 1, 2009, through December 31, 2009. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocation in Part*, 75 Fed. Reg. 60,076 (Dep't of Commerce Sept. 29, 2010).

During the investigation, Commerce found that Korea's short-term export financing program, provided by KEXIM, was a countervailable subsidy. *See Final Affirmative Countervailing Duty Determinations and Final Negative Critical Circumstances Determinations: Certain Steel Products From Korea,* 58 Fed. Reg. 37338, 37350 (Dep't of Commerce Jul. 9, 1993).  In this administrative review, Commerce continued to examine the

short-term export financing program, found that KEXIM provides short-term export financing to

Korean exporters that manufacture goods under export contracts, and preliminarily determined

that this short-term financing was countervailable.  *See Corrosion-Resistant Carbon Steel Flat*

*Products From the Republic of Korea: Preliminary Results of Countervailing Duty*

*Administrative Review*, 76 Fed. Reg. 54,209, 54,211 (Dep't of Commerce Aug. 31, 2011)

(*Preliminary Results*).  Specifically, Commerce found that KEXIM provides both short-term

trade financing and comprehensive export financing:

> KEXIM provides short-term loans to Korean exporters that
> manufacture goods under export contracts.  The loans are provided
> up to the amount of the bill of exchange or contracted amount, less
> any amount already received. For comprehensive export financing
> loans, KEXIM supplies short-term loans to any small or medium-
> sized company, or any large company that is not included in the
> five largest conglomerates based on their comprehensive export
> performance. To obtain the loans, companies must report their
> export performance periodically to KEXIM for review.
> Comprehensive export financing loans cover from 50 to 90 percent
> of the company's export performance.

*Preliminary Results*, 76 Fed. Reg. at 54,211.

During the review, HYSCO reported that it received [      ] short-term export financing

loans from KEXIM that were "effective during the 2009 POR," but that the loan agreements for

these short-term loans had been approved in 2008.  *See* HYSCO Questionnaire Resp. at Exh. K-

1, pp. 1-2 and K-3, C.R. 1-3 (Dec. 15, 2010) (Pl. Appx Tab 1).[1]  Accordingly, in the *Preliminary*

*Results*, Commerce continued to find the program a countervailable subsidy and countervailed

the loans.  *Preliminary Results*, 76 Fed. Reg. at 54,211.  Commerce calculated HYSCO's benefit

from this loan program by comparing the amount of interest paid on the KEXIM loans to the

---

[1]  In citing to the administrative record, we follow the convention identified in the
plaintiff's brief.  References to the confidential administrative record are designated as C.R. Doc.
1 or C.R. Doc. 2, followed by the document number.  Where the document has been included in
the appendix to plaintiff's motion, we additionally cite to the appendix tab number.

amount of interest that would have been paid on a comparable commercial loan. *Id*. Commerce calculated the commercial benchmark using a weighted average of all the interest rates on HYSCO's commercial short-term loans outstanding during the 2009 period of review. *Id*. at 54,210-11. Commerce divided the resulting benefit by the value of HYSCO's total exports, resulting in a net subsidy rate of 0.09 percent *ad valorem*. *Id.* at 54,211.

After issuing its *Preliminary Results*, Commerce sent supplemental questionnaires to HYSCO, requesting further information regarding the commercial loans that were part of the benchmark calculation for the KEXIM loans. HYSCO's response to these supplemental questionnaires demonstrated that [      ] of the commercial loans were short-term variable rate loans taken out in 2008, similar to the KEXIM loans. HYSCO Suppl. Questionnaire Resp. (Dec. 2, 2011) at 1 and Exh. K-9, C.R. Doc. 13 (Pl. Appx Tab 5). HYSCO obtained these [     ] short-term, variable rate loans from [                    ]. *Id.* Commerce requested additional information from HYSCO regarding these loans.

Specifically, Commerce requested that HYSCO explain how the interest rates for the [     ] commercial short-term, variable rate loans [                         ] were determined. Suppl. Questionnaire (Dec. 22, 2011) at 3-4, C.R. Doc. 2-16 (Pl. Appx Tab 6). In response, HYSCO provided documents demonstrating that the interest rates for the [           ] loan was comprised of a base rate, plus a spread, [                      ]. HYSCO Suppl. Questionnaire Resp. (Jan. 11, 2012) at 1-5, C.R. Doc. No. 2-17 (Pl. Appx Tab 7). For the loan that HYSCO received from [        ], the interest rate was comprised of a base interest rate, a spread, [                     ]. *Id.* at 2-4. This additional [                ] is payable to [                          ], and is collected as a part of the interest payment when HYSCO borrows from banks without providing collateral. *Id.* at 2. In this case, the [

4

] amount was included in the interest rate calculation for the [          ], and

[      ] transferred [                              ] to [                              ]. *Id.*

Commerce issued the *Final Results* on March 5, 2012.  *Final Results*, 77 Fed. Reg. at

13,093.  For the *Final Results*, Commerce changed its benchmark calculation for the short-term,

variable rate loans that HYSCO had received from KEXIM.  Specifically, Commerce first

removed from the benchmark calculation those commercial loans that HYSCO had taken out in

2009, because the KEXIM loans for which the benchmark was being calculated were taken out

in 2008.  *Final Results* at Comment 1.  In other words, the short-term loan benchmark was

"based on information from comparable commercial loans taken out in 2008." *Id.*  Second,

because HYSCO's KEXIM loans were variable rate loans, Commerce recalculated the

benchmark to include only the "commercial variable-rate short term loans taken out by HYSCO

in 2008."[2] *Id.*  Finally, Commerce calculated an interest rate benchmark using a base interest

rate and an interest rate spread that was "determined by the commercial banks as reported on

HYSCO's actual variable rate short-term loans taken out in 2008." *Id.*

Specifically, Commerce added the [                    ] and [                  ], as

applicable for the relevant commercial loans, and added these components to the variable base

interest rate, [

] for the [     ] reported commercial loans.  *Final Results* at Comment 1,

Final Results Calculation Memo for Hyundai HYSCO (Feb. 27, 2012) at Attachment B, p. 6

(Final Calculation Memo), C.R. Doc. 22 (Pl. Appx Tab 9).  Commerce then applied the resulting

commercial benchmark rate from the [     ] reported commercial loans, to the interest payments

made by HYSCO on the KEXIM loans to determine the actual amount of interest that HYSCO

---

[2]  The benchmark calculation for the *Preliminary Results* included all short-term loans
taken out in 2008, both fixed and variable rate.  *Final Results* at Comment 1.

would have paid on the KEXIM loans if the company paid a commercial interest rate instead of a government-set interest rate.  Final Calculation Memo at Attachment B, p. 6.  In other words, because the interest rate for a variable rate loan varies over a given period of time, Commerce used the actual reported interest rates from HYSCO'S [    ] commercial loans, to calculate a benchmark that accounted for the actual dates HYSCO made payments on its KEXIM loans. *Final Results* at Comment 1; Final Calculation Memo at Attachment B, p. 6.

As a result, HYSCO's *ad valorem* subsidy rate for the KEXIM loans dropped from the 0.09 percent calculated for the *Preliminary Results*, to 0.03 percent for the *Final Results*, and its total *ad valorem* subsidy rate was 0.46 percent, which is a *de minimis* rate.  *Final Results*, 77 Fed. Reg. at 13, 094.

## SUMMARY OF ARGUMENT

Commerce properly calculated a comparable benchmark for HYSCO's short-term, variable rate KEXIM loans, one which accounted for the variability of interest rates over time. In doing so, Commerce complied with 19 U.S.C. § 1677(5)(E)(ii), which requires that the agency measure the countervailable benefit from a government loan by comparing it to a commercial loan with comparable terms.  Because Commerce's calculation of a benchmark for HYSCO's short-term, variable rate KEXIM loans was consistent with statute and Commerce's own regulations, the determination should be affirmed.

Commerce accounted for the variability of the interest rate on the KEXIM loans by calculating what the interest rate for comparable commercial loans would have been had payments been made on the same dates as payments were made on the KEXIM loans.  Had Commerce not done so, the benchmark for the benefit calculation would not have accounted for

the "variability" of the variable rate commercial benchmark and KEXIM loans and would not have been "comparable" in accordance with section 1677(5)(E)(ii).

During the terms of the KEXIM loans and the commercial benchmark loans, the daily published base interest rate [        ] for the commercial loans fluctuated from a high of 6.18 percent to a low of 2.41 percent.  Therefore, in order to determine the actual commercial interest rate that HYSCO would have had to pay on KEXIM loans, Commerce had to determine the base rate that would have been applied on the date of each interest payment.

Because Commerce calculated this benchmark using the actual reported interest rates from HYSCO'S commercial loans, obtained in the same year as the KEXIM loans, the benchmark was determined by the terms of commercial loans that HYSCO could "actually obtain on the market," in accordance with 19 U.S.C. § 1677(5)(E)(ii).  Because Commerce's *Final Results* was based upon substantial evidence and in accordance with law, this Court should deny U.S. Steel's motion for judgment on the agency record.

ARGUMENT

I.    Standard Of Review

In reviewing Commerce's antidumping and countervailing duty determinations, "the Court of International Trade must sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with the law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).  "Substantial evidence" is defined as "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  Even if it is possible to draw inconsistent conclusions from the evidence contained in the record, this does not render

Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar.*

*Comm'n*, 383 U.S. 607, 620 (1966).

When the Court examines Commerce's statutory interpretations, it employs the two-

pronged test established in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S.

837, 842-43 (1984).  First, the Court examines "whether Congress has directly spoken to the

precise question at issue," and if it has, the agency must comply with the clear intent of

Congress.  *Id.*  If "the statute is silent or ambiguous with respect to the specific issue, the

question for the court is whether the agency's answer is based on a permissible construction of

the statute."  *Id.* at 843.  In such cases, "{a}ny reasonable construction of the statute is a

permissible construction."  *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004)

(citation and quotation marks omitted), and Commerce's "interpretation governs in the absence

of unambiguous statutory language to the contrary or unreasonable resolution of language that is

ambiguous."  *United States v. Eurodif S.A*., 555 U.S. 305, 316 (2009); *see also Pesquera Mares*

*Australes Ltda. v. United States,* 266 F.3d 1372, 1382 (Fed. Cir. 2001).

When Commerce promulgates regulations to implement its statutory prerogatives, its

interpretations of its own regulations are entitled to even greater deference.  *Cathedral Candle*

*Co. v. U.S. Int'l Trade Comm'n*, 400 F.3d 1352, 1363-64 (Fed. Cir. 2005) ("Deference to an

agency's interpretation of its own regulations is broader than deference to the agency's

construction of a statute, because in the latter case the agency is addressing Congress's

intentions, while in the former it is addressing its own.").

Finally, the "law does not require that {Commerce} make an explicit response

to every argument made by a party, but instead requires that issues material to the agency's

determination be discussed so that the 'path of the agency may reasonably be discerned' by a

reviewing court." *Timken United States Corp. v. United States*, 421 F.3d 1350, 1354 (Fed. Cir.

2005) (quoting Uruguay Rounds Agreements Act, Statement of Administrative Action, H.R.

Doc. No. 103-316 (1994) at 892).

II.     The Statute And Regulations Require Commerce To Compare
         Government Loans To Comparable Commercial Loans To Calculate Benefit

        "Countervailing duties are imposed on foreign products that are imported, sold, or likely

to be sold in the United States, where the foreign government is directly or indirectly subsidizing

the manufacture, production, or export of that merchandise." *Royal Thai Gov't v. United States*,

502 F. Supp. 2d 1334, 1339-40 (Ct. Int'l Trade 2007) (citations omitted).  When a foreign

government has provided a loan, there is a benefit to the recipient when the amount of interest

paid on the government loan is less than the "amount the recipient would pay on a comparable

commercial loan that the recipient could actually obtain on the market."  19 U.S.C.

§ 1677(5)(E)(ii).  Because the statute is silent as to the specifics of how Commerce should

calculate the interest for benchmark loans, Commerce's regulations fill this gap and provide

instructions for how to calculate long-term and short-term loan benchmarks.  *See* 19 C.F.R.

§ 351.505(a)(2)(iii)-(iv).

        Commerce has declared that the "structure, maturity and currency denomination of the

loans" in question are "the three most important characteristics" in determining whether a

commercial loan is comparable to one provided by a government.  *Countervailing Duties: Final

Rule*, 63 Fed. Reg. 65,348, 65,363 (Dep't of Commerce Nov. 25, 1998) (*Preamble*).  Thus, its

regulations provide that, for the purposes of selecting a comparable loan, Commerce "will place

primary emphasis on similarities in the structure of the loans (*e.g.*, fixed interest rate v. variable

interest rate), the maturity of the loans (*e.g.*, short-term v. long-term), and the currency in which

the loans are denominated."  19 C.F.R. § 351.505(a)(2)(i).

To identify comparable loans that a recipient could actually obtain on the market, Commerce "will rely on the actual experience of the firm in question in obtaining comparable commercial loans for both short-term and long-term loans." 19 C.F.R. § 351.505(a)(3)(i).  Since 1989, Commerce has preferred company-specific benchmarks as "a more accurate measure of the benefit, if any, to a recipient of a government-provided short-term loan" over national averages.  *Preamble*, 63 Fed. Reg. at 65,364.  Indeed, Commerce may use a national average interest rate for comparable commercial loans only where the firm "did not take out any comparable commercial loans during the period."  19 C.F.R. § 351.505(a)(3)(ii).

III.    The Benchmark For HYSCO's KEXIM Loans Relied Upon Comparable
        Loans That HYSCO Could Actually Obtain On the Market

The KEXIM loans for which Commerce had to calculate a benchmark were variable rate, short term loans.  To find comparable commercial loans, Commerce looked to HYSCO's experience in obtaining short-term, variable rate commercial loans.  Commerce found that [

] provided the best basis for calculating a benchmark, because these loans were taken out in the same year as the KEXIM loans, and their structure and maturity were the same as the KEXIM loans.  *See* HYSCO Suppl. Questionnaire Resp. (Dec. 2, 2011) at 1 and Ex. K-9; *see also* 19 C.F.R. § 351.505(a)(2).  Specifically, like the KEXIM loans, these commercial loans were variable rate, short-term loans.  HYSCO Suppl. Questionnaire Resp. (Dec. 2, 2011) at 1 and Exhibit K-9.  Accordingly, Commerce based its benchmark calculation upon only these [     ] comparable loans.  *Final Results* at Comment 1.  U.S. Steel does not appear to challenge Commerce's selection of these two loans as comparators.  *See* Pl. Br. at 15.

For short-term loans, Commerce "normally will use an annual average of the interest rates on comparable commercial loans during the year in which the government-provided loan

was taken out, weighted by the principal amount of each loan." 19 C.F.R. § 351.505(a)(2)(iv).

Neither the statute nor the regulations, however, specify how to account for variable interest rates

in a benchmark calculation.  Commerce accounted for the variability of the interest rate for the

commercial benchmark loans and the KEXIM loans by calculating the interest rate HYSCO

would have paid on the KEXIM loans had it paid the interest determined for the comparable

commercial loans rather than a government-set interest rate.

Because the interest rates for a variable rate loan vary over a given period of time,

Commerce used the actual comparable terms of the reported interest rates from HYSCO's [      ]

commercial loans, to calculate a benchmark to determine the actual commercial interest rates that

HYSCO would have paid on its KEXIM loans.  *Final Results* at Comment 1; Final Calculation

Memo at Attachment B, p. 6.  To calculate the interest rate for comparable commercial loans,

Commerce had to first determine the daily published base [          ] applicable to the dates

interest was paid on the KEXIM loans. Commerce then added the [                   ] and

[                        ], as applicable for the relevant commercial loans, to the base rate, [

                                        ].  *Final Results* at

Comment 1, Final Calculation Memo at Attachment B, p. 6.  Commerce then weighted the

resulting rates by the principal amount of the [      ] reported commercial loans, to determine the

commercial benchmark interest rate that HYSCO should have paid for the KEXIM loans.  Final

Calculation Memo at Attachment B, p. 6.

Thus, the commercial benchmark interest rates used by Commerce to calculate the

benefit on the KEXIM 2009 interest payments reflected the terms of commercial loans that

HYSCO could "actually obtain on the market."  19 U.S.C. § 1677(5)(E)(ii).  Had Commerce not

calculated its benchmark in this manner, the commercial benchmark for the benefit calculation

would not have accounted for the "variability" of the variable rate KEXIM loans and would not have been "comparable" as required by section 1677(5)(E)(ii).

In the absence of any specific guidance from the statute or regulations regarding how to account for the variability of interest rates on variable rate loans, Commerce developed a reasonable methodology to calculate a comparable benchmark for a short-term, variable rate loan in accordance with 19 U.S.C. § 1677(5)(E)(ii) and 19 C.F.R. § 351.505(a)(2)(iv).  Commerce's selection of a reasonable methodology that is consistent with 19 U.S.C. § 1677(5)(E)(ii)'s "comparability" requirement should be afforded deference.  *Chevron*, 467 U.S. at 843.  Indeed, even greater deference is owed to Commerce's expertise in its selection and development of proper methodologies to calculate antidumping and countervailing duty rates.  *Fujitsu*, 88 F.3d at 1039; *Thai Pineapple Pub. Co. v. United States*, 187 F.3d 1362, 1367 (Fed. Cir. 1999).

The record evidence indicated that the KEXIM loans had variable interest rates.  Although section 351.505(a)(2)(iv) provides that Commerce "normally will use an annual average of the interest rates on comparable commercial loans" to determine the benefit conferred under a short-term loan program, the regulations do not address how Commerce should account for variable interest rates in these calculations.  In the absence of specific guidance on calculating benchmarks for variable rate loans, Commerce devised a methodology that adhered to the statutory mandate, that the commercial benchmark be comparable to the government loan, by accounting for the variability of a variable rate loan in its calculations. Further, as required by 19 C.F.R. § 351.505(a)(2)(iv), Commerce calculated the commercial benchmark using the variable rate commercial loans taken out in the same year in which the government loans were taken out. Consequently, Commerce's benchmark calculation for HYSCO's KEXIM loans was based upon substantial evidence and in accordance with law.

U.S. Steel argues that Commerce's benchmark calculation was "artificial," because Commerce constructed a benchmark to estimate the interest that would have been paid on a commercial loan on the same date that HYSCO made interest payments on its KEXIM loans. U.S. Steel further contends that Commerce's benchmark construction constituted a decision to "reject the actual interest rates charged on HYSCO's variable rate short-term loans, in favor of a constructed and artificial loan benchmark."  Pl. Br. at 18-19.

There was nothing "artificial" about Commerce's benchmark construction.  Commerce calculated the benchmark "using the interest rate spread determined by the commercial banks *as reported on HYSCO's actual variable rate short-term loans taken out in 2008*."  *Final Results* at Comment 1 (emphasis added).  Commerce used the actual [



] to calculate a benchmark to determine the actual commercial interest rates that HYSCO would have paid on its KEXIM loans.  Final Calculation Memo at Attachment B, p. 6.  By doing so, Commerce ensured, in accordance with 19 C.F.R. § 351.505(a)(3), that its commercial benchmark reflected the terms of commercial loans that HYSCO could, and did, obtain on the market.

U.S. Steel does not contend that the [                                        ] were inaccurate or "artificial" in any way.  Rather, U.S. Steel objects to the fact that Commerce attempted to account for the very terms of the KEXIM loans *i.e.*, that the interest payments would vary over time, by ensuring that for the benefit calculation, the payments made on the KEXIM loans were compared to the payments made on commercial loans, had the payments for the commercial loans been made on the same date.

U.S. Steel argues that Commerce should have used the "weighted average interest rates" of HYSCO's commercial loans in its benchmark calculations, in accordance with 19 C.F.R. § 351.505(a)(2)(iv), without first accounting for the variable interest rates.  Pl. Br. at 18.  Had Commerce done so, however, the commercial benchmark for the benefit calculation would not have accounted for the "variability" of the variable rate KEXIM loans and would not have been "comparable" in accordance with sections 1677(5)(E)(ii) and 351.505(a)(2).

Alternatively, U.S. Steel argues that Commerce could have used the national average interest rates for short term loans in Korea, in accordance with 19 C.F.R. § 351.505(a)(3)(ii).  Pl. Br. at 19.  As an initial matter, it is unclear how a national average of interest rates would account for the variability of the interest rates on the KEXIM loans, any more than the weighted average of the [                          ] loans proposed by U.S. Steel, because neither methodology would project what the interest payment for the commercial loans would have been on the specific dates that HYSCO made the KEXIM loan interest payments.  At best, U.S. Steel's argument amounts to a suggestion that there was another reasonable methodology, an argument that does survive *Chevron* deference.  *Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1570 (Fed. Cir. 1994) (explaining that, to survive judicial scrutiny, Commerce's interpretation of a statute need not be the most reasonable).

More importantly, by regulation, Commerce may use the national average of interest rates on comparable loans only "{i}f the firm did not take out any comparable commercial loans during the period. . . ."  19 C.F.R. § 351.505(a)(3)(ii).  As explained above, Commerce "will rely on the actual experience of the firm in question in obtaining comparable commercial loans for both short-term and long-term loans."  19 C.F.R. § 351.505(a)(3)(i).  The agency prefers

company-specific benchmarks as "a more accurate measure of the benefit, if any, to a recipient

of a government-provided short-term loan." *Preamble*, 63 Fed. Reg. at 65,364.

HYSCO did take out comparable commercial loans, and Commerce based its benefit

calculation upon these short term, variable rate commercial loans in accordance with 19 C.F.R.

§ 351.505(a)(1)-(2).  Commerce devised a methodology that adhered to the mandate in section

1677(5)(E)(ii), that the benchmark commercial loan be comparable to the government loan, by

accounting for the variability of a variable rate loan in its calculations.  Consequently,

Commerce's benchmark calculations for HYSCO's KEXIM loans were reasonable, in

accordance with law, and should be sustained.

## IV.   Commerce Was Not Required To Use Methodologies From Past Proceeding Based Upon A Different Factual Record

U.S. Steel cites to Commerce's determinations in prior segments of this proceeding,

when Commerce did not construct the benchmark for KEXIM loans in this manner, and argues

that the benchmark calculation for this review unreasonably departed from the agency's prior

practice.  Pl. Br.at 17-18.  Commerce must make its determinations based upon the

administrative record before the agency in each separate segment of a proceeding.  *See Shandong*

*Huarong Mach. Co. v. United States*, 29 C.I.T. 484, 491 (2005) (noting that "each administrative

review is a separate segment of proceedings with its own unique facts").

It is unclear whether, in prior segments, Commerce had the extensive record evidence

that it did in this segment.[3]  The record before Commerce in this proceeding demonstrated

precisely how the KEXIM short-term, variable rate interest payments were calculated, and

---

[3] U.S. Steel concedes that it was put on notice that the agency might be considering constructing a variable interest rate benchmark only when Commerce requested that HYSCO provide it with information on the components of the interest rates charged by [
      ]. Pl. Br. at 8.  This concession at least suggests that previous segments of this proceeding did not contain this level of detail regarding the types of comparator commercial loans.

allowed the agency to construct a benchmark that accounted for the variable interest rates on the KEXIM loans.  Presumably, this sort of information was not on the record in prior reviews, and without it, Commerce would not have been able to construct a benchmark accounting for variable interest rates.  Moreover, in the prior review, Commerce did not receive the same comments from interested parties raising the issue of the calculated short-term benchmark that it did in this administrative review.

In this proceeding, the record evidence demonstrated that the KEXIM loans were short-term loans with variable interest rates.  Therefore, consistent with the statute and regulation, Commerce calculated a loan benchmark using commercial loans with variable interest rates.  To have ignored this information would have been inconsistent with Commerce's obligation to calculate margins as accurately as possible.  *See Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442, 1443 (Fed. Cir. 1994) (observing Commerce's duty to determine margins as accurately as possible, and to use the best available information in doing so).

Even if Commerce simply decided to change its benchmark calculation methodology in this proceeding, it is permitted to do so if it provides a reasonable explanation for the change. *SKF USA, Inc. v. United States*, 630 F.3d 1365, 1373 (Fed. Cir. 2011); *see Chevron*, 467 U.S. at 863-64.  As demonstrated above, the information on the record demonstrated that the KEXIM loans were variable rate short-term loans.  Therefore, Commerce calculated a commercial loan benchmark based upon the terms of the commercial loans provided with variable interest rates.  Because the interest rate for a variable rate loan will vary over a given period of time, Commerce reasonably calculated a benchmark for a short-term, variable rate loan that was comparable to the KEXIM loans.  Commerce's methodology was consistent with 19 U.S.C. § 1677(5)(E)(ii), because it accounted for the variability of the interest rates.

CONCLUSION

For the foregoing reasons, we respectfully request that the Court deny plaintiff's motion

for judgment on the agency record and dismiss the complaint.

                              Respectfully submitted,

                              STUART F. DELERY
                              Acting Assistant Attorney General


                              JEANNE E. DAVIDSON
                              Director


                              /s/Reginald T. Blades, Jr.
                              REGINALD T. BLADES, JR.
                              Assistant Director


OF COUNSEL:                   /s/Tara K. Hogan
SAPNA SHARMA                  TARA K. HOGAN
Attorney                      Senior Trial Counsel
Office of the Chief Counsel   Commercial Litigation Branch
  for Import Administration    Civil Division
Department of Commerce        Department of Justice
                              P.O. Box 480
                              Ben Franklin Station
                              Washington, DC 20044
                              Tele: (202) 616-2228

March 25, 2013                Attorneys for Defendant

17